**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 3 1998**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

PHOUC H. NGUYEN, a/k/a Jimmy
Nguyen,

        Defendant - Appellant.

No. 97-3106

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 94-10129-01)

---

David Autry, Oklahoma City, Oklahoma, for Defendant-Appellant.

D. Blair Watson, Assistant United States Attorney (Jackie N. Williams, United
States Attorney; and Lanny D. Welch, Assistant United States Attorney, with him
on the brief), Wichita, Kansas, for Plaintiff-Appellee.

---

Before **ANDERSON** , **McKAY** , and **BRISCOE** , Circuit Judges.

---

**McKAY** , Circuit Judge.

---

Defendant appeals his convictions for interference with interstate commerce by robbery, aiding and abetting the robbery, and aiding and abetting the killing of Mrs. Barbara Sun. The charges against Defendant stem from his involvement in the robbery of the Mandarin Restaurant and Lounge in Wichita, Kansas, and the murder of Mrs. Sun on November 8, 1994. Mrs. Sun owned and operated the restaurant with her husband, Mr. Mark Sun. Defendant, accompanied by three co-defendants, entered the Mandarin to initiate the robbery. While two of the co-defendants tied up Mr. Sun and a waiter, Defendant and co-defendant Mr. Bountaem Chanthadara took Mrs. Sun upstairs. Mrs. Sun was beaten and shot five times. She died that evening from multiple gunshot wounds. Following the robbery and the murder of his wife, Mr. Sun closed the restaurant for twenty-two days. The restaurant reopened for six months before it permanently closed in June 1995.

On January 4, 1996, Defendant was charged in a superseding indictment with two counts: (1) interference with interstate commerce by robbery in violation of 18 U.S.C. § 1951 [Hobbs Act], and aiding and abetting the robbery in violation of 18 U.S.C. § 2; and (2) carrying and using a firearm during and in relation to the robbery in violation of 18 U.S. C. § 924(c)(1), causing the death of a person through the use of a firearm, which constitutes murder under 18 U.S.C. §§ 924(i)(1) & 1111(a), and aiding and abetting the killing of Mrs. Sun in

-2-

violation of 18 U.S.C. § 2. The district court denied Defendant's motions to suppress statements and to dismiss Count 2, and a jury convicted Defendant on both counts. The jury convicted Defendant under Count 2 for aiding and abetting the murder of Mrs. Sun. Defendant was sentenced to 240 months imprisonment on Count 1 and life imprisonment without the possibility of release on Count 2, to be served concurrently. Defendant raises several issues on appeal.

## I. Voluntariness of Defendant's Statement

Defendant argues that his Fifth Amendment rights were violated by the district court's erroneous admission of his post-arrest statement to the FBI in which he confessed involvement in the robbery. He asserts that the statement was involuntary because it was conditioned on assurances of favorable treatment and leniency, however slight. After a hearing, the district court found that Defendant's statement was voluntary and denied his motion to suppress.

In reviewing a district court's denial of a motion to suppress a statement or confession, we accept the district court's underlying factual findings unless they are clearly erroneous. See United States v. Roman-Zarate, 115 F.3d 778, 783 (10th Cir. 1997). The ultimate issue of whether a statement was voluntary is a question of law which we review *de novo*. See Miller v. Fenton, 474 U.S. 104, 110 (1985); United States v. Perdue, 8 F.3d 1455, 1466 (10th Cir. 1993). A

-3-

determination of voluntariness is based on the totality of the circumstances. See Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973); Perdue, 8 F.3d at 1466. We examine several factors including the characteristics of the suspect, such as his age, intelligence, and education, and the details of the interrogation, such as whether the suspect was informed of his rights, the length of the detention and the interrogation, and the use or threat of physical force. See Roman-Zarate, 115 F.3d at 783; Perdue, 8 F.3d at 1466; United States v. Muniz, 1 F.3d 1018, 1021 (10th Cir.), cert. denied, 510 U.S. 1002 (1993).

Several factors indicate that Defendant's statement was given voluntarily. Defendant testified at the suppression hearing that he was advised of his Miranda rights and that he understood those rights before making his statement. He admitted that he initialed the waiver of rights form and conceded that the FBI agent neither threatened him nor used physical force against him. See Muniz, 1 F.3d at 1022. "[T]here is no evidence suggesting [Defendant] was unusually susceptible to coercion because of age, lack of education, or intelligence." Roman-Zarate, 115 F.3d at 783. The record shows that Defendant was twenty-one years old at the time of his arrest, had a GED, was comfortable with the English language, was intelligent, and was capable of understanding his statement when it was reduced to writing. Defendant's correction of one word in the written statement provides support for the court's determination that Defendant was alert

and cooperative and acted of his own free will.  The district court correctly found that "[t]he interview itself was conducted in a non-coercive fashion and was not lengthy."  R., Vol. II, Doc. 123 at 5.  We note that, although courts may consider whether a defendant knew the nature of the offense under investigation when determining the voluntariness of a confession, this confession was not coerced merely because the police did not inform Defendant of all the potential charges that could be brought against him.      See United States v. Braxton   , 112 F.3d 777, 783-84 (4th Cir.) (stating that officers have no duty to inform suspects of nature of crime being investigated unless suspect asks),      cert. denied , __ U.S. __ , 118 S. Ct. 192 (1997);   cf. Colorado v. Spring   , 479 U.S. 564, 575-77 (1987) (holding that "a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege");      Harvey v. Shillinger , 76 F.3d 1528, 1536-37 (10th Cir.) (holding defendant's statement voluntary because the "Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege") (quotation marks and citation omitted),      cert. denied , __ U.S. __ , 117 S. Ct. 253 (1996).

At the suppression hearing, Defendant testified that his confession was coerced because the FBI agent told him about the penalties he would face and

indicated that he might receive lenient treatment if he cooperated. FBI Agent Wenko, however, testified at the suppression hearing that he did not make any offers of assistance or leniency and did not discuss possible sentences with Defendant. Agent Wenko also stated that no one else made such statements in his presence. In attempting to resolve this discrepancy and determine the credibility of the witnesses, the district court found both Defendant and Agent Wenko credible. "[I]nsofar as the discrepancy [was] concerned," however, the court found the FBI agent's "testimony to be more credible, primarily because so much of [it] was corroborated by [D]efendant." R., Vol. II, Doc. 123 at 7.

Defendant argues that the court's credibility determination was erroneous because Agent Wenko changed his testimony at trial and, therefore, Defendant's own testimony at the suppression hearing is more credible. At trial, Agent Wenko testified that he neither discussed the length of a sentence with Defendant nor made any statements about informing the prosecutor or judge if Defendant cooperated. This testimony is consistent with Agent Wenko's testimony at the suppression hearing. Agent Wenko also testified at trial that another FBI agent present at the interview, Agent Flosnick, *may* have made statements about cooperation or length of sentence. This trial testimony represents that Agent Wenko could not testify, of his own knowledge, that nobody else made such statements. The agent's trial testimony is sufficiently consistent with his prior

testimony at the suppression hearing that it does not constitute newly discovered evidence, even if it is slightly different than his suppression hearing testimony. In any case, a statement to inform the prosecutor of a defendant's cooperation without any other indications of coercion does not constitute a promise of leniency. See Roman-Zarate, 115 F.3d at 780, 783-84; United States v. Garot, 801 F.2d 1241, 1244-45 (10th Cir. 1986); cf. Clanton v. Cooper, 129 F.3d 1147, 1158-59 (10th Cir. 1997) (stating that evidence that sheriff told suspect he would get twenty-five-year sentence if he did not confess, but would get off lightly if he did confess, raised question of fact over whether confession was voluntary); Griffin v. Strong, 983 F.2d 1540, 1541-42 (10th Cir. 1993) (holding that statement was coerced by threat that defendant would be unable to see his child again coupled with promise to protect defendant's health and safety in jail). Any such statement that is *possibly* attributable to Agent Flosnick did not coerce Defendant's statement. After reviewing the entire record and considering the totality of the circumstances, we hold that the record supports the court's difficult credibility determination, its determination that Defendant's statement was given voluntarily, and its decision that no new evidence supported Defendant's claim of coercion. See Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 575 (1985) (great deference owed to credibility determinations). The court did not err in admitting Defendant's statement at trial.

-7-

## II. Sufficiency of the Evidence

Defendant argues that the evidence was insufficient to convict him on both Count 1 and Count 2. We review the sufficiency of the evidence *de novo*, viewing the evidence and the inferences therefrom in a light most favorable to the government to determine if a reasonable jury could find beyond a reasonable doubt that the defendant was guilty. See United States v. Voss, 82 F.3d 1521, 1524-25 (10th Cir.), cert. denied, ___ U.S. ___, 117 S. Ct. 226 (1996).

Defendant argues that the government did not satisfy the requirements of the Hobbs Act in Count 1 because the evidence did not demonstrate that the robbery affected interstate commerce. The Hobbs Act is implicated if someone "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires to do so." 18 U.S.C. § 1951(a). After the Supreme Court's decision in United States v. Lopez, 514 U.S. 549 (1995), we held that, to support a conviction under the Hobbs Act, the government must show only that the defendant's acts had a minimal effect on interstate commerce. See United States v. Bolton, 68 F.3d 396, 397-99 (10th Cir. 1995), cert. denied, 516 U.S. 1137 (1996). The minimal effect on commerce may be established by evidence that the assets of a business engaged in interstate commerce, or which customarily purchases items in

interstate commerce, are depleted.     See id. at 399; United States v. Zeigler, 19

F.3d 486, 489-90 (10th Cir.),     cert. denied , 513 U.S. 1003 (1994).  The depletion

of assets curtails "the victim's potential as a purchaser of such goods."     Zeigler ,

19 F.3d at 490 (quotation marks and citation omitted).

During trial, the government presented evidence which showed that the

Mandarin Restaurant was a business engaged in interstate commerce and that its

assets were depleted by the robbery.  Mr. Sun testified that, before the robbery,

the restaurant had often purchased specialty food products from vendors in

California, Missouri, and Oklahoma, and that the money stolen by Defendant

would have been used to purchase more of those items.  He testified that the

restaurant purchased fewer out-of-state items after the robbery, in part because it

closed for twenty-two days and also because business decreased significantly after

it reopened due to customers' fears about dining at the restaurant.  Mr. Sun also

testified that purchases by customers using out-of-state credit cards declined after

the robbery.  According to Mr. Sun's testimony, the business eventually failed as

a result of the robbery because he could not run the restaurant himself, attract

customers, or generate revenue, and, therefore, he could not purchase supplies in

interstate commerce for the restaurant.  An FBI agent confirmed Mr. Sun's

statements, testifying that credit card sales declined and business revenues

decreased after the robbery.  We conclude that the record evidence and the

inferences therefrom demonstrated the requisite effect on interstate commerce.

Defendant claims that the murder of Mrs. Sun, which was committed during the robbery, should not be considered as proof of the effect of the robbery on interstate commerce. The government may show the effect-on-commerce requirement not only by the effect of stolen money on interstate commerce but also by evidence showing an "interference '*in any way* or *degree*' . . . by robbery or extortion." United States v. Boston, 718 F.2d 1511, 1516 (10th Cir. 1983) (further emphasis added) (quoting 18 U.S.C. § 1951(a)), cert. denied, 466 U.S. 974 (1984); cf. United States v. Paredes, 139 F.3d 840, 844-45 (11th Cir. 1998) (holding that meager evidence showing use of firearm purchased out of state and victims' sale of merchandise manufactured out of state was sufficient to demonstrate robbery's minimal effect on commerce); United States v. Castleberry, 116 F.3d 1384, 1388-89 (11th Cir.) (discussing evidence presented to show effect on commerce of extortion), cert. denied, __ U.S. __, 118 S. Ct. 341 (1997). Events which occur during the course of a possible Hobbs Act robbery may affect interstate commerce. Consider, for example, if Defendant robbed the Mandarin when it was full of customers and, during the course of that robbery, he threatened and frightened many loyal customers. Perhaps his actions against those customers constituted assault under state law. In this scenario, the customers then testify at trial that they were too frightened to ever return to the

-10-

restaurant and Mr. Sun testifies that the loss of loyal customers affected his ability to generate income and purchase goods in interstate commerce. Under the language of the Hobbs Act, this hypothetical testimony of the customers and Mr. Sun would be appropriate evidence showing an effect of the robbery on interstate commerce. See 18 U.S.C. § 1951(a).

Testimony relating to the murder committed during the course of the robbery of the Mandarin is no different from this hypothetical testimony, even if the murder constitutes a separate crime. Mr. Sun's testimony and other evidence recited above indicates that a nexus existed between the loss of the business and Mrs. Sun's death. Her murder, committed during the course of the robbery, was a consequence of the robbery that could be considered for its effect on interstate commerce. Testimony indicating that fewer customers patronized the restaurant after the robbery and murder, that Mr. Sun could not run the business by himself without the assistance of his wife, and that business steadily declined until Mr. Sun had to close his restaurant constitutes appropriate evidence showing the robbery's impact on interstate commerce.

The money stolen from Mrs. Sun's purse also could legitimately be considered for its effect on interstate commerce. The money was stolen during the course of the robbery of the restaurant. It was taken from Mrs. Sun's purse which was located inside the restaurant and which belonged to the co-owner and

-11-

operator of a business engaged in interstate commerce. The aggregate impact of the theft of the restaurant money, the decline in credit card sales and business revenue, and the temporary closing after the robbery, the murder of Mrs. Sun, and the money stolen from her purse establishes more than a minimal nexus to interstate commerce. See Wickard v. Filburn, 317 U.S. 111, 127-29 (1942). We affirm Defendant's conviction on Count 1.

Defendant also contends that the evidence was insufficient to convict him of aiding and abetting the murder of Mrs. Sun in Count 2. He argues that, although he intended to commit the robbery, the government failed to prove malice aforethought, the level of intent necessary to prove murder and aiding and abetting murder under 18 U.S.C. §§ 2 & 1111(a). He asserts that there was no proof that he planned or intended to murder anyone or that he encouraged his co-defendant to kill Mrs. Sun.

One is guilty of violating 18 U.S.C. § 924(j)(1)[1] if he caused the death of a person while using a firearm to commit a crime of violence in violation of section 18 U.S.C. § 924(c)(1). The evidence unequivocally showed that co-defendant Mr. Chanthadara violated 18 U.S.C. § 924(j) by shooting Mrs. Sun during the course of the robbery. This killing constitutes a felony murder under 18 U.S.C.

[1] The statute under which Defendant was charged and convicted, 18 U.S.C. § 924(i)(1), has been changed to 18 U.S.C. § 924(j)(1). For the sake of future clarity, we refer to section 924(i) as section 924(j).

§ 1111(a). The statute defines murder as the "unlawful killing of a human being with malice aforethought," and characterizes felony murder as first degree murder which is "[e]very murder . . . committed in the perpetration of, or attempt to perpetrate, any [of the listed felonies]." 18 U.S.C. § 1111(a); see United States v. Kayarath, 962 F. Supp. 1399, 1401 (D. Kan. 1997); see also United States v. Tham, 118 F.3d 1501, 1508 (11th Cir. 1997). We have interpreted section 1111(a) and the felony murder doctrine to mean that a person who commits a dangerous felony, such as a robbery, "is guilty of murder if a death occurs during the commission of [the] felony." Montoya v. United States Parole Comm'n, 908 F.2d 635, 638 (10th Cir. 1990) (also stating that felony murder "allow[s] conviction for a death that was unintended and unforeseen").

The essence of Defendant's argument is that the government must establish some proof of state of mind other than the intent to commit the robbery and the fact that the killing occurred during the commission of the robbery. The federal murder statute's definition of felony murder does not require the government to prove any intent other than that the killing was committed in the course of the underlying felony. See 18 U.S.C. § 1111(a). Therefore, in this case, once the government has shown that Defendant intended to commit the robbery and that a killing occurred in the course of that robbery, no additional proof of state of mind is necessary. This analysis is supported by our statements in Montoya and is not

-13-

inconsistent with Sides. See Montoya, 908 F.2d at 639 (stating that malice aforethought "is supplied by [the intent to commit] the robbery"); accord United States v. Flores, 63 F.3d 1342, 1371 (5th Cir. 1995), cert. denied sub nom. Garza v. United States, __ U.S. __, 117 S. Ct. 87 (1996); United States v. Thomas, 34 F.3d 44, 48-49 (2d Cir.), cert. denied sub nom. Morales v. United States, 513 U.S. 1007 (1994); cf. United States v. Chischilly, 30 F.3d 1144, 1160 (9th Cir. 1994) (stating that commission of underlying felony substitutes for malice aforethought), cert. denied, 513 U.S. 1132 (1995); United States v. Sides, 944 F.2d 1554, 1558 (10th Cir.) (holding that defendant was guilty of aiding and abetting murder because he intended to commit a dangerous felony and continued to participate in the felony despite being aware of a serious risk of death), cert. denied, 502 U.S. 989 (1991).

In this case, the evidence before the jury undoubtedly showed the requisite intent for a conviction under Count 2. The record indicates that Defendant admitted to participating in the armed robbery which resulted in the killing of Mrs. Sun. The government did not need to show that Defendant had any specific intent to kill Mrs. Sun. We emphasize that the government also presented sufficient evidence that Defendant aided and abetted the killing of Mrs. Sun. The record indicates that Defendant held Mrs. Sun at gunpoint, brought her upstairs, and beat her. Defendant committed these acts knowing that his co-defendant, Mr.

-14-

Chanthadara, was armed, was present in the room where Defendant beat Mrs. Sun, and was often violent and uncontrollable. These facts show that Defendant initiated and participated in the assault which led to the death of Mrs. Sun even though he was aware of his co-defendant's propensity for violence. The evidence also shows that Defendant did not leave the room after he beat Mrs. Sun but was present when his co-defendant shot her five times and that Defendant and co-defendant Mr. Chanthadara came downstairs and left the restaurant together. It is reasonable to infer from this evidence that Defendant's participation in the robbery and in the assault on Mrs. Sun incited or encouraged his co-defendant's murder of Mrs. Sun. We affirm Defendant's conviction on Count 2 because the record contains abundant evidence to enable a jury to find beyond a reasonable doubt that Defendant intended to commit the underlying felony, that Mrs. Sun was killed during the commission of that felony, and that Defendant aided and abetted that killing.

### III. Constitutionality of 18 U.S.C. § 924(c) & (j)(1) [2]

Defendant asserts that his conviction on Count 2 should be reversed because Congress exceeded its authority under the Commerce Clause in enacting

---

[2] As we noted previously, section 924(j) is the former section 924(i) cited by the parties in their briefs.

-15-

18 U.S.C. § 924(c) & (j)(1). Defendant, citing the Supreme Court's decision in Lopez, 514 U.S. 549, argues that the statute does not contain an independent jurisdictional element and does not regulate or effect interstate commerce. The statute "simply criminalizes federally the use of a firearm in connection with a crime of violence . . . and the murder of someone killed with a firearm during such a crime of violence." Appellant's Br. at 33.

Section 924(j)(1) reads:

> A person who, in the course of a violation of subsection (c), causes the death of a person through the use of a firearm, shall–
>
> . . . if the killing is a murder (as defined in section 1111), be punished by death or by imprisonment for any term of years or for life.

To be convicted of aiding and abetting a murder in violation of section 924(j)(1), Defendant must have first violated section 924(c)(1) by using or carrying a firearm during and in relation to a crime of violence. That requirement has been met because we held above that the evidence supported the crime of violence, an armed robbery, and its impact on interstate commerce under the Hobbs Act. This court has upheld the constitutionality of the Hobbs Act in the face of a Commerce Clause challenge. See Bolton, 68 F.3d at 398-99. In Bolton, we also upheld the validity of the defendant's section 924(c) convictions because the section 924(c) crime of violence was dependent on Hobbs Act jurisdiction. See id. at 399 n.2. Bolton has been interpreted as affirming the constitutionality of section 924(c)(1)

-16-

"insofar as it prohibits the use or carrying of a firearm during or in relation to a crime of violence." United States v. Crump , 120 F.3d 462, 466 (4th Cir. 1997) (interpreting Bolton and upholding the constitutionality of section 924(c)(1) in relation to drug trafficking crimes). Several other circuits have rejected Commerce Clause challenges to section 924(c)(1). See United States v. Walker , 142 F.3d 103, 111 (2d Cir. 1998) (holding that section 924(c)(1) is valid exercise of Commerce Clause power because its crimes of violence and drug trafficking crimes are activities that substantially affect interstate commerce); United States v. Harris , 108 F.3d 1107, 1109 (9th Cir. 1997) (same as to crime of violence); United States v. Staples , 85 F.3d 461, 463 (9th Cir.) (same as to drug trafficking crime), cert. denied , __ U.S. __ , 117 S. Ct. 318 (1996); United States v. Brown , 72 F.3d 96, 97 (8th Cir. 1995) (same), cert. denied , 518 U.S. 1033 (1996). We agree with our sister circuits and, in light of any uncertainty about Bolton , we now explicitly uphold Congress' exercise of its Commerce Clause power in enacting 18 U.S.C. § 924(c)(1).

We also uphold the constitutionality of 18 U.S.C. § 924(j). In this case, the robbery represents the crime of violence which is a necessary element of the section 924(j) offense charged in Count 2. Because Defendant's section 924(j) conviction is predicated on his conviction under the Hobbs Act for an armed robbery that affected interstate commerce, we reject his Lopez challenge to

-17-

section 924(j). See United States v. Lopez, 2 F.3d 1342, 1348 n.10 (5th Cir. 1993), aff'd, 514 U.S. 549 (1995). The section 924(j) conviction properly relied upon the interstate commerce nexus requirement of the robbery conviction. In other words, the jurisdictional requirement of the underlying crime of violence in section 924(c) creates a sufficient nexus to interstate commerce for section 924(j) as well.

### IV.  Jury Instructions

Defendant argues that the district court's jury instructions were improper and misled the jury. We review a district court's decision whether to give a particular instruction for abuse of discretion. See United States v. Swallow, 109 F.3d 656, 658 (10th Cir. 1997). In reviewing jury instructions to which an objection was made at trial, we apply a *de novo* standard "to determine the propriety of [those] . . . instruction[s]." United States v. Mullins, 4 F.3d 898, 900 (10th Cir. 1993). Essentially, we must determine "whether the jury, considering the instructions as a whole, was misled." Id.

Defendant contends that the court erred in refusing to instruct the jury that it could not consider the effect on interstate commerce of both the murder of Mrs. Sun and the money stolen from Mrs. Sun's purse. We reject this challenge for two reasons. First, we determined above that evidence of Mrs. Sun's murder was

-18-

appropriately considered in determining whether the robbery had an effect on interstate commerce under the Hobbs Act. As we previously stated, her death is a consequence of the robbery which could be considered for its impact on interstate commerce. Second, the jury also could appropriately consider the money stolen from Mrs. Sun's purse for its impact on interstate commerce. The money was stolen during the course of the robbery of the restaurant from Mrs. Sun's purse located inside the restaurant. More importantly, the money was stolen from the purse that belonged to an owner and operator of a business engaged in interstate commerce. These facts distinguish the cases relied on by Defendant, United States v. Quigley, 53 F.3d 909, 910 (8th Cir. 1995), and United States v. Collins, 40 F.3d 95, 100 (5th Cir. 1994), cert. denied, 514 U.S. 1121 (1995), which involved individuals not directly or actively engaged in interstate commerce at the time of the robbery. The court did not abuse its discretion in refusing to instruct the jury that it could not consider the murder of Mrs. Sun and the money stolen from her purse for their effects on interstate commerce.

Defendant also contends that the district court erroneously instructed the jury that his actions, i.e., the robbery, could have a "potential" or "probable" effect on interstate commerce rather than an actual effect. Appellant's Opening Br. at 45. The court instructed the jury that the government must establish beyond a reasonable doubt that "[a]s a result of the defendant's actions, interstate

commerce, or an item moving in interstate commerce, was actually or potentially delayed, obstructed, or affected in any way or degree." R., Vol. III, Doc. 189 at Instr. No. 9. The court also instructed:

> If you find that the defendant intended to take certain actions--that is, he did the acts charged in the indictment in order to obtain property-- and you find those actions have either caused, or would probably cause, an effect on interstate commerce, then you may find the requirements of this element have been satisfied.

Id. at Instr. No. 11. The court stated that Defendant did not need to intend to affect interstate commerce but that the effect on interstate commerce may be a natural consequence of his actions. Id.

The use of the words actual, potential, and probable explain to the jury the type of effects on interstate commerce that the government must show to meet the jurisdictional requirement under the Hobbs Act. These words represent the kind of aggregate or cumulative impact that is the linchpin of the interstate commerce nexus established in Wickard, 317 U.S. at 127-28. See Lopez, 514 U.S. at 558-60, 567. Under an aggregate or cumulative analysis, and in the context of the instructions as a whole, the words probable and potential indicate to the jury that, like the wheat in Wickard, the government is not required to show that the particular stolen dollars themselves would have entered the stream of interstate commerce. Instead, the government must show only that the stolen dollars depleted the total assets of the restaurant which were available to engage in

-20-

interstate commerce.

We have held that a depletion of assets potentially affecting interstate commerce constitutes a sufficient nexus to interstate commerce under the Hobbs Act. See Zeigler, 19 F.3d at 490. To establish this de minimis effect on interstate commerce the government must show that the crime depleted the assets of a business engaged in interstate commerce, "thereby curtailing the victim's potential as a purchaser of goods." [3] Id. at 489-90; accord United States v. Stillo, 57 F.3d 553, 558-60 (7th Cir.) (holding that evidence and instructions are sufficient to support jury finding that extortion could potentially deplete assets used in interstate commerce), cert. denied, 516 U.S. 945 (1995); United States v. Brown, 959 F.2d 63, 67-68 (6th Cir. 1992) (stating that especially in cases of attempted crimes, the government may prevail by showing "that there was a *realistic probability* that the activity would have affected interstate commerce"); United States v. Curcio, 759 F.2d 237, 241-42 (2d Cir.) (stating that effects of defendant's extortion on interstate commerce need be only "potential or subtle"), cert. denied sub nom. Hawley v. United States, 474 U.S. 848 (1985); cf. Quigley, 53 F.3d at 910 (discussing direct effect on commerce required in most cases and

---

[3] Defendant's argument that the use of the potential or probable language is limited to extortion or attempt cases is invalid in light of our approval in Zeigler of the potential "depletion of assets" effects on interstate commerce. Zeigler was not an attempt or extortion case but involved multiple completed robberies. See 19 F.3d at 489-90.

realistic probability of an effect sufficient in extortion case).

The use of the word "probable" in the instructions also represents to the jury its ability to make a determination based on the likelihood that the robbery affected interstate commerce. Cf. Zeigler, 19 F.3d at 496 (Ebel, J., dissenting) (construing issue before court in robbery case as "whether the jury was provided adequate evidence to conclude that . . . it [was] likely, beyond a reasonable doubt, that each of the robberies affected interstate commerce"). This is one way, if not the best way, to explain that a robbery injury to the assets of a business engaged in interstate commerce is sufficient to satisfy Wickard's rule of aggregate impact and the Hobbs Act de minimis jurisdictional requirement. See Bolton, 68 F.3d at 397-400 (holding that under the asset depletion theory, robbery or extortion of small amounts of money from businesses that purchase goods from another state has a sufficient potential aggregate effect on interstate commerce). Defendant's reliance on United States v. Levine, 41 F.3d 607, 613 (10th Cir. 1994), is misguided because Levine determined *when* an effect on interstate commerce has to occur, not *whether* it actually occurs or has the potential to occur. See United States v. Grey, 56 F.3d 1219, 1224 (10th Cir. 1995) (stating that effect must occur at or after the defendant's activity, not before it).

The government correctly points out that this court approved a jury instruction in which the government was required to prove that the defendant

"actually or potentially obstructed, delayed, or affected interstate commerce or attempted to do so." Boston, 718 F.2d at 1516. Although the validity of this instruction does not appear to have been directly challenged in Boston, we cannot now say that the court in this case erred in repeating essentially the same instruction. The court's inclusion of the words probable and potential in the instructions, while perhaps not the best way to explain to the jury the interstate commerce requirement, did not constitute error. The jury was properly instructed and was not misled.

Finally, Defendant asserts that the court's instruction on malice aforethought "prejudicially collapsed the separate elements of 'robbery' and 'malice' into a single element" for Count 2. Appellant's Opening Br. at 47. The court instructed the jury that "[a] killing is done with malice aforethought when it is done deliberately and with the intent to kill another person, or if it results from the commission of a robbery." R., Vol. III, Doc. 189 at Instr. No. 17. The latter part of this instruction essentially parallels the definition of felony murder under 18 U.S.C. § 1111(a): "Every murder . . . committed in the perpetration of, or attempt to perpetrate, any [listed felony such as a robbery]."

As in his sufficiency of the evidence argument, Defendant claims that, to be convicted of Count 2, the government must present proof of his state of mind which is in addition to and separate from his intent to commit the underlying

felony and the proof that a killing occurred during the commission of that felony. In accordance with our discussion above, Defendant's argument has no merit. The statute does not require any proof of intent other than that Defendant intended to commit the underlying felony and that the killing was committed in the course of that felony. Therefore, a charge of felony murder does not entitle Defendant to an instruction requiring additional or independent proof of state of mind. The instruction in this case comports with the felony murder definition that all killings committed in the perpetration of a robbery constitute first degree murder. See 18 U.S.C. § 1111(a); Montoya, 908 F.2d at 638-39 (stating that "one is guilty of murder if a death occurs during the commission of a felony"); see also Schad v. Arizona, 501 U.S. 624, 640-41 (1991) (stating that "the intent to kill and the intent to commit a felony were alternative aspects of the single concept of 'malice aforethought'" and that "statutes have in most cases retained premeditated murder and some form of felony murder (invariably including murder committed in perpetrating . . . a robbery) as alternative means of satisfying the mental state that first-degree murder presupposes"); Thomas, 34 F.3d at 48-49 (approving an instruction which was virtually identical to the one in this case).

Defendant's claims are also supplanted by the court's separate instructions to the jury which described what the government must show to establish that Defendant aided and abetted the killing of Mrs. Sun, see id. at Instr. No. 18, and

which articulated the elements of a robbery, a Hobbs Act crime, and a violation of 18 U.S.C. § 924(c), see id. at Instr. Nos. 8, 13-15. Further, the court explained the distinct elements that the government must prove to sustain its burden of proof in Count 2. See id. at Instr. No. 16. We believe that the instructions as a whole properly defined the state of mind required to prove a violation of 18 U.S.C. § 924(j)(1) and felony murder and did not prejudice Defendant.

Defendant's convictions are AFFIRMED.