**UNITED STATES of America**

v.

**Kenneth A. TATUM.**

**Criminal No. 1:99CR164(2)(TH).**

United States District Court,
E.D. Texas,
Beaumont Division.

Aug. 10, 2000.

George Patrick Black FPD, Federal Public Defender, Tyler, TX, for Kenneth A Tatum.

Robert James Middleton, AUSA, Tyler, TX, for United States.

## MEMORANDUM OPINION REGARDING MOTIONS TO SUPPRESS DEFENDANT'S STATEMENTS

HEARTFIELD, District Judge.

Before the Court are two motions by defendant Kenneth A. Tatum seeking suppression of statements he contends were extracted in violation of his Fifth Amendment rights: *Defendant's Motion to Suppress Statements of Kenneth A. Tatum* [Clerk's Docket No. 364] and *Defendant's*

*Motion to Suppress Statements of Kenneth A. Tatum to John Wesley Walsh* [Clerk's Docket No. 363]. Both motions were filed June 22, 2000. On July 31, 2000, the Court entered orders denying the motions for the reasons which follow [Clerk's Docket Nos. 480, 476].

## I. PROCEDURAL BACKGROUND

Kenneth A. Tatum is before this Court for alleged violations of 18 U.S.C. § 2113 (entering bank with intent to commit felony—attempted armed bank robbery resulting in death), 18 U.S.C. § 924(j) (use of a firearm in the course of a crime of violence or murder), 18 U.S.C. § 1951(a) (interference with commerce by robbery or attempted robbery) and 18 U.S.C. § 2 (aiding and abetting).

The defendant was arraigned on June 2, 1999, at which time he pled not guilty to counts one and two of the indictment. On October 22, 1999, the defendant was advised that the government intended to seek the death penalty. The case was set for jury selection on July 31, 2000 [Clerk's Docket No. 190].

On June 22, 2000, defendant filed several pre-trial motions, including a *Motion to Suppress Statements of Kenneth A. Tatum* [Clerk's Docket No. 364] and a *Motion to Suppress Statements of Kenneth A. Tatum to John Wesley Walsh* [Clerk's Docket No. 363]. The government filed responses in opposition to the motions on July 5, 2000 [Clerk's Docket No. 438, 441]. The Court held an evidentiary hearings on the motion with the defendant present on July 25, 2000 and July 26, 2000, respectively. On July 31, 2000, the Court entered orders denying the motions for the reasons which follow [Clerk's Docket Nos. 480, 476].

## II. BACKGROUND

Defendant seeks the exclusion of statements he contends were elicited from him in violation of the Fifth Amendment to the United States Constitution, which provides in relevant part that:

"[n]o person ... shall be compelled in any criminal case to be a witness against himself...."

The defense advances two arguments in support of the position that his Fifth Amendment rights were violated: one, that the statements he gave were not voluntary and, two, that he did not knowingly and intelligently waive his privilege against self incrimination and his right to counsel.

## III. LEGAL BACKGROUND

### A. Statements Must be Voluntary

■ Constitutional due process prohibits the use of coercive government conduct to extract incriminating statements from the accused. *See Colorado v. Connelly*, 479 U.S. 157, 165, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). To this end, only voluntarily-made incriminating statements are admissible in the prosecution's case-in-chief. *Id.* The voluntariness requirement ensures that the means used to obtain statements are " 'compatible with a system that presumes innocence and ... that conviction will not be secured by inquisitorial means.' " *See United States v. Barlow*, 41 F.3d 935, 945 (5th Cir.1994), *cert. denied*, 514 U.S. 1030, 115 S.Ct. 1389, 131 L.Ed.2d 241 (1995).

■ The government has the burden of proving by a preponderance of the evidence that the accused voluntarily made the incriminating statements it seeks to admit. *See United States v. Mullin*, 178 F.3d 334, 341 (5th Cir.1999), *cert. denied*, 528 U.S. 990, 120 S.Ct. 454, 145 L.Ed.2d 370 (1999). The voluntariness determination is a question of law which turns upon the facts of each case. *See United States v. Posada–Rios*, 158 F.3d 832, 866 (5th Cir.1998).

■ " 'Coercive police activity is a necessary predicate finding that a [statement] is not "voluntary" within the meaning of the Due Process Clause.' " *See United States v. Garcia Abrego*, 141 F.3d 142, 170 (5th Cir.1998), *cert. denied*, 525 U.S. 878, 119 S.Ct. 182, 142 L.Ed.2d 148

(1998). "[O]verreaching by law enforcement" is a "prerequisite to a determination that [an incriminating statement] is involuntary for purposes of the … Due Process Clause." *Id.* By way of example, a confession extracted under threat of physical violence is involuntary. *See Arizona v. Fulminante,* 499 U.S. 279, 287, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

Once a coercive finding has been made, the trial court then considers all of the circumstances surrounding the giving of the incriminating statement. The Supreme Court's most recent articulation of the due process voluntariness test calls for an examination of " 'whether a defendant's will was overborne' by the circumstances surrounding the giving of [an incriminating statement]." *See Dickerson v. United States,* 530 U.S. 428, 120 S.Ct. 2326, 2331, 147 L.Ed.2d 405 (2000). "The due process test takes into consideration the totality of all the surrounding circumstances—both the characteristics of the accused and details of the interrogation." *Id.* "The determination 'depend[s] upon a weighing of the circumstances of pressure against the power of resistance of the person confessing.' " *Id.*

" 'Cases in which a defendant can make a colorable argument that a self-incriminating statement was "compelled" despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare.' " *See Dickerson,* 120 S.Ct. at 2336.

A promise of leniency does not *per se* render a confession involuntary. *See Hawkins v. Lynaugh,* 844 F.2d 1132, 1140 (5th Cir.1988), *cert. denied,* 488 U.S. 900, 109 S.Ct. 247, 102 L.Ed.2d 236 (1988); *see also United States v. Jaswal,* 47 F.3d 539, 542 (2d Cir.1995). Rather, it is but one factor to consider in determining whether the statement was voluntarily made. *Id.* Even so, representing to a suspect that his cooperation will be communicated to the prosecutor does not constitute an impermissible promise of leniency. *See United States v. Nguyen,* 155 F.3d 1219, 1223 (10th Cir.1998), *cert. denied,* 525 U.S. 1167, 119 S.Ct. 1086, 143 L.Ed.2d 87 (1999); *see also United States v. Ballard,* 586 F.2d 1060, 1063 (5th Cir.1978). "Encouraging a suspect to tell the truth and suggesting that his cohorts might leave him 'holding the bag' does not, as a matter of law overcome a confessor's will." *See Ballard,* 586 F.2d at 1063.

**B. *Effective Waiver of Fifth Amendment Rights***

Under *Miranda* and its progeny, statements made by an accused during custodial interrogation may not be used against him unless he was first advised of his Fifth Amendment rights. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *see also Dickerson,* 120 S.Ct. at 2335–36. An accused may waive these rights provided he does so knowingly, intelligently and voluntarily. *See Garcia Abrego,* 141 F.3d at 171.

The government bears the burden of proving by a preponderance of the evidence that the defendant was informed of his Miranda rights and that he effectively waived those rights.

"It is axiomatic that an accused must be informed of his Miranda rights in a way that ensures his knowing, intelligent and voluntary exercise or waiver thereof." *See United States v. Collins,* 40 F.3d 95, 98 (5th Cir.1994), *cert. denied,* 514 U.S. 1121, 115 S.Ct. 1986, 131 L.Ed.2d 873 (1995).

After it has been established that the warning were given, the focus then shifts to the accused's behavior in response to the warnings. The question is whether the defendant made an uncoerced choice to effectively waive his Miranda rights with the requisite level of comprehension. *See Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

What constitutes effective waiver escapes precise definition and necessarily turns on the facts of each case. "[W]aiver may be direct or … inferred

from the defendant's words and actions." *See United States v. Chapa–Garza*, 62 F.3d 118, 121 (5th Cir.1995). Even so, "there must be some affirmative act demonstrating a waiver of Miranda rights." *See Chapa–Garza*, 62 F.3d at 121. "Mere answering of questions is insufficient to show waiver." *Id.* In considering whether there has been an effective waiver of the Miranda rights, courts have weighed several factors in the balance:

A waiver is not invalid because: (1) law enforcement did not advise the accused of the subject matter of the interrogation; (2) the accused did not have " 'a full and complete appreciation of all of the consequences flowing from the nature and quality of the evidence in the case;' " and (3) the accused was not informed that he was suspected of an offense for which he could receive the death penalty. *See Barnes v. Johnson*, 160 F.3d 218, 222–23 (5th Cir.1998), *cert. denied*, 526 U.S. 1118, 119 S.Ct. 1768, 143 L.Ed.2d 798 (1999).

Court not persuaded that waiver was ineffective where the accused: (1) was under the influence of mind altering mediation at the time of the waiver; (2) had the equivalent of an eighth grade education; and (3) did not have a rudimentary understanding of his constitutional rights or the judicial process. *See Garcia Abrego*, 141 F.3d at 171–72.

The accused waived his Fifth Amendment rights where he was advised of his rights, indicated he understood those rights and thereafter elected to talk with the arresting law enforcement agent. *See United States v. Gaytan*, 74 F.3d 545, 555 (5th Cir.1996), *cert. denied*, 519 U.S. 821, 117 S.Ct. 77, 136 L.Ed.2d 36 (1996). "As long as the defendant is given Miranda warnings, his voluntary decision to answer questions without invoking the right to counsel constitutes waiver." *Id.*

Waiver effective where accused made incriminating statements after he was Mirandized because there was no evidence he did not understand his rights. *See United States v. Fields*, 72 F.3d 1200, 1213 (5th Cir.1996), *cert. denied*, 519 U.S. 807, 117 S.Ct. 48, 136 L.Ed.2d 13 (1996).

The accused waived his Fifth Amendment rights where he refused to sign the waiver, but indicated verbally and by his body language that he would discuss the charge with law enforcement. *See Chapa–Garza*, 62 F.3d at 121–22.

Waiver effective where: (1) accused appeared to read and understand the Miranda form, but refused to sign it; (2) law enforcement advised the accused that he did not have to discuss the case with them, but that he could if he wanted to do so, to which he replied, "okay"; and (3) accused could effectively waive rights in light of his age (38), education (GED) and his familiarity with criminal justice system as a consequence of his extensive criminal history *See Collins*, 40 F.3d at 98.

"[T]here could be no doubt" that the accused waived her Fifth Amendment right where, after being informed of her rights but refusing to sign a written waiver, the accused immediately began talking to the agents and continued to do so for one hour. *See United States v. Smith*, 218 F.3d 777 (7th Cir.2000). She neither requested an attorney nor expressed a desire for questioning to cease. *Id.* Under these facts, the Seventh Circuit held that "there can be no credible argument that [the accused's] conduct was not a waiver of her Miranda rights." *Id.*

## C. *Miranda Warnings Only Required Prior to Custodial Interrogation*

Because the Miranda warnings seek to protect constitutional rights during the course of " 'incommunicado interrogation of individuals in a police-dominated atmosphere,' " suspects are only entitled to the warnings prior to custodial interrogation. *See Illinois v. Perkins*, 496 U.S. 292, 296, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990). "It is the premise of Miranda that the danger of coercion results from the interaction of custody and official interrogation." *Id.*

 "Custodial interrogation means 'questioning initiated by law enforcement officers after a person has been taken into custody....'" *Id.; see also United States v. Gonzales,* 121 F.3d 928, 939 (5th Cir. 1997). "'[I]nterrogation' as conceptualized in Miranda, must reflect a measure of compulsion above and beyond that inherent custody itself." *See Gonzales,* 121 F.3d at 939.

 "Conversations between suspects and undercover agents do not implicate the concerns underlying Miranda." *See Perkins,* 496 U.S. at 296, 110 S.Ct. 2394. Rather, "[c]oercion is determined from the perspective of the suspect." *Id.* "[P]olice dominated atmosphere and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate." *Id.* This is so because "[w]hen a suspect considers himself in the company of cellmates and not officers, the coercive atmosphere is lacking." *Id.* "[W]here a suspect does not know that he is conversing with a government agent, these pressures do not exist." *Id.* "'[W]hen the agent carries neither badge nor gun and wear not "police blue," but the same prison grey' as the suspect, there is no 'interplay between police interrogation and police custody.'" *Id.*

"Miranda forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust in one he supposes to be a fellow prisoner." *Id.*

## IV. FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. Interview I—January 8, 1999

#### 1. Findings of Fact

On January 8, 1999, Sergeant Beddingfield of the Smith County Sheriff's Office

transported[1] the defendant to the F.B.I. office in Tyler, Texas at the request of F.B.I. Special Agent Garrett O. Floyd. Tr. 137.

Floyd introduced himself to the defendant and made his credentials available for inspection. Tr. 140.

Before questioning the defendant, Floyd advised him of his Miranda rights, utilizing a standard rights advisory form.[2] Tr. 140. After reading each right aloud, Floyd inquired whether the defendant understood what he had said, to which the defendant responded that he did. Tr. 141. The defendant stated that "he had been arrested on numerous occasions" and that he understood his rights. Tr. 141; 142–43. Floyd then read the standard waiver of rights to him aloud, which the defendant also indicated he understood. Tr. 141 The defendant refused to sign the waiver, but expressed a willingness to speak to Floyd. Tr. 141; 163.

The interview took place in a large conference room decorated with pictures on the walls. Tr. 138–39. Sergeant Beddingfield was present for the duration of the interview, but did not participate. Tr. 138–39. The interview lasted approximately one hour. Tr. 143. The defendant was not shackled during the interview. Tr. 162; 164; 171. Floyd provided the defendant with something to drink. Tr. 144. At the conclusion of the interview, the defendant told Floyd to "come back to see him" whenever law enforcement had some additional information regarding the crimes. Tr. 144.

#### 2. Conclusions of Law

 The Court concludes that the government has shown by a preponderance of

---

1. The defendant was at that time incarcerated in Smith County Jail on charges unrelated to the murders. Tr. 136–37.

2. At the January 22, 1999 interview, the defendant acknowledged that he was advised of

his rights prior to the commencement of questioning at every interview. *See Gov't Ex. O at 2.* Moreover, the defense acknowledges that he was verbally advised of his rights. *See Def.'s Mot. at II.*

the evidence that the statements made by the defendant at the January 8, 1999 interview were voluntary. In reaching this conclusion, the Court considered the totality of the circumstances. There is no evidence before the Court of any coercive police tactics or overreaching on the part of law enforcement. The interview was conducted by one agent with one member of law enforcement present as a witness. The interview took place in a large F.B.I. conference room, and there is nothing to suggest that the setting was in any way coercive. Nor can it be said that the length of the interview was coercive.

Moreover, there is nothing to indicate that the defendant's will was overborne by the circumstances attendant to the interview. He was not shackled or restrained in any way. The defendant was advised of his rights prior to the commencement of questioning and he, therefore, knew that he was entitled to counsel, that he was not required to talk to Floyd and that his statements could be used against him. His prior dealings with law enforcement further supports the position that he understood his rights. He was aware of the egregious nature of the charges at issue and knew that he was considered a suspect. That the defendant invited future communication with Floyd further supports the Court's conclusion that his statements were voluntarily made.

 The Court also concludes that the defendant effectively waived his Fifth Amendment rights. The government has proven by a preponderance of the evidence that the defendant, after being advised of his rights, made an uncoerced choice to waive those rights with the requisite level of comprehension as to the consequences. There is no indication that he did not understand his rights; to the contrary, the defendant assured Floyd that he did. That the defendant refused to sign the waiver is of no significance to the issue of whether he effectively waived his rights.

## B. *Interview II—January 11, 1999*

### 1. *Findings of Fact*

On January 11, 1999, the defendant was again transported to the F.B.I. office in Tyler, Texas at Floyd's request. Tr. 145–46. As before, Sergeant Beddingfield accompanied the defendant, as he was still incarcerated on the unrelated charges. Tr. 146.

After exchanging pleasantries, the defendant acknowledged that Floyd had "to go through the rights." Tr. 145. Floyd advised the defendant of his rights; the defendant verbally acknowledged that he understood his rights. Tr. 147. The defendant again refused to sign the waiver for the stated reason that "[he] didn't sign stuff," Tr. 147. The defendant made clear that he was willing to speak to Floyd. Tr. 163.

The interview lasted approximately one hour Tr. 148–49. His shackles were removed and he was given a soft drink. Tr. 148–49. The defendant again told Floyd that he was willing to talk to Floyd in the future. Tr. 149.

### 2. *Conclusions of Law*

The Court concludes that the government has shown by a preponderance of the evidence that the statements made by the defendant at the January 11, 1999 interview were voluntary. In reaching this conclusion, the Court took into account the totality of the circumstances. There is no evidence before the Court of any coercive police tactics or overreaching on the part of law enforcement. The interview was conducted by one agent with one member of law enforcement present as a witness. The interview took place in a large F.B.I. conference room—a non-coercive setting. The length of the interview cannot be said to have been coercive.

Moreover, there is nothing to indicate that the defendant's will was overborne by the circumstances surrounding the interview. He was not shackled or restrained in any way. The defendant was advised of

his rights prior to the commencement of questioning and he, therefore, knew that he was entitled to counsel, that he was not required to talk to Floyd and that his statements could be used against him. His prior dealings with law enforcement further supports the position that he understood his rights. He was aware of the egregious nature of the charges at issue and knew that he was considered a suspect. That the defendant invited future communication with Floyd further supports the Court's conclusion that his statements were voluntarily made.·

The Court also concludes that the defendant effectively waived his Fifth Amendment rights. The government has proven by a preponderance of the evidence that the defendant, after being advised of his rights, made an uncoerced choice to waive those rights with the requisite level of comprehension as to the consequences.

## C. *Interview III—January 14, 1999*

### 1. *Findings of Fact*

On January 14, 1999, the defendant was brought to an interview room on the eighth floor of the Smith County building, again at Floyd's request. Tr. 150–51. A concealed video recorder was set up to record the interview, from which a transcription was later made. Tr 150.

Floyd and his partner Ranger Prince greeted the defendant. Floyd then advised the defendant of his rights and read the standard waiver of rights to him. Tr. 150; *see also Ex. L at 3*. The defendant does not dispute that he was advised of his rights. *See Def.'s Mot. at II*.

Although he indicated a willingness to speak to them, the defendant again refused to sign the waiver, reminding Floyd that he did not sign. Tr. 151; 163; *see also Govt. Ex. L at 3*. The defendant acknowledged that he told Floyd at the last interview that he had encouraged Floyd to come back to talk when he had more information about the murders. Tr. 2; 79. *See Govt. Ex. L at 3*. Food, drink, bathroom breaks and cigarettes were made readily available to the defendant. Tr. 154; *see also Govt. Ex. L at 37; 45; 58; 116–17; 133*. The interview lasted in excess of one hour. Tr. 155.

At the conclusion of the interview, Floyd asked the defendant whether they had put pressure on him, to which he answered "oh, no." *See Govt. Ex. L at 173*. He described what had taken place as nothing more than a "conversation." *See Govt. Ex. L at 173*.

### 2. *Conclusions of Law*

The Court concludes that the government has shown by a preponderance of the evidence that the statements made by the defendant at the January 14, 1999 interview were voluntary. In reaching this conclusion, the Court took into account the totality of the circumstances. The defendant characterized the interview as a conversation and specifically stated that he was not pressured in any way. There is no evidence before the Court of any coercive police tactics or overreaching on the part of law enforcement. The interview was conducted by two agents. The interview took place at the Smith County building, and there is nothing to suggest that the setting or length of the interview was in any way coercive.

Moreover, there is nothing to indicate that the defendant's will was overborne by the circumstances attendant to the interview. Food, drink, bathroom breaks and cigarettes were made readily available to the defendant. He was not shackled or restrained in any way. The defendant was advised of his rights prior to the commencement of questioning and he, therefore, knew that he was entitled to counsel, that he was not required to talk to them and that his statements could be used against him. His prior dealings with law enforcement further supports the position that he understood his rights. He was aware of the egregious nature of the charges at issue and knew that he was considered a suspect. That the defendant

invited future communication with Floyd further supports the Court's conclusion that his statements were voluntarily made.

The Court also concludes that the defendant effectively waived his Fifth Amendment rights. The government has proven by a preponderance of the evidence that the defendant, after being advised of his rights, made an uncoerced choice to waive those rights with the requisite level of comprehension as to the consequences.

### D. *Interview IV—January 22, 1999*

#### 1. *Findings of Fact*

On January 22, 1999 the defendant was interviewed by Floyd and Texas Ranger Prince at the Smith County building.[3] Tr. 155–56. This interview was also videotaped and a transcription was subsequently made. Tr. 156. The defendant acknowledged that he had been advised of his rights prior to each interview. *See Govt. Ex. O at 2.* The defendant was Mirandized prior to the commencement of questioning:

*Tatum:* Can I ask you a question?

*Agent Floyd:* Yeah.

*Tatum:* Every time you get ready to talk to me you got to read that?

*Agent Floyd:* Every time. Every time.

*Tatum:* I was just wondering.

*Agent Floyd:* You must understand your rights. You have the right to remain silent. You understand that?

*Tatum:* Yes.

*Agent Floyd:* Anything you say can be used against you in court. You understand that?

*Tatum:* Yes.

*Agent Floyd:* You have a right to talk to a lawyer for advice before we ask you any questions. You understand that?

*Tatum:* Yeah.

*Agent Floyd:* You have a right to have a lawyer with you during questioning. If you cannot afford a lawyer, one will be appointed for you before any questions if you wish. Do you understand that?

*Tatum:* Yes.

*Agent Floyd:* If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. In other words, when you talk to us, as you've done in the past, you can stop at any time that you want to, right?

*Tatum:* (No audible response).

*Agent Floyd:* Waiver of rights. I've read the statement of rights. I understand what my rights are. At this time, I am willing to answer questions without a lawyer present. Do you understand that?

*Tatum:* Uh-huh (affirmative).

*Agent Floyd:* You're not going to sign it? Okay. But you understand?

*Tatum:* Yeah.

*See Govt. Ex. O at 3–4.* The defendant does not dispute that he was advised of his rights. *See Def.'s Mot. at II.* He stated that he was familiar with Miranda procedures given his five previous arrests. *See Govt. Ex. O at 5.* Although the defendant refused to sign the rights advisory form, he verbally waived his rights. Tr. 158; 163. Partially through the interview, Floyd reminded the defendant that he had been apprised of his Miranda rights, and the defendant confirmed that he understood those rights. *See Govt. Ex. O at 21–22.* Toward the end of the interview, Floyd twice acknowledged that the defendant never invoked his right to an attorney. *See Govt. Ex. O at 176–77; 195–96.*

---

**3.** At the end of the interview, a F.B.I. Special Agent Jeff Block spoke briefly with the defen- dant. Tr. 170.

The interview lasted approximately 2.5 hours. Tr. 169. They provided the defendant with food, drink, cigarettes and bathroom breaks. Tr. 161–62; *see also Govt. Ex. O at 175–76; 203*. His shackles were removed and he was not restrained in any way during the interview. Tr. 162; 171. As he had been in the past, the defendant was solicitous of Floyd, and told him to "come back to talk" if there were any developments in the investigation. Tr. 163.

Floyd made the following statement to the defendant: "Deal is, you tell us the truth what happened [sic]. We'll tell the judge and the government attorneys and state attorney what you told us. We can't make you any promises or anything else, and we go from there." *See Govt. Ex. O at 41*. Later in the interview, Floyd told the defendant that they could not promise him anything, but that they would tell the judge and the prosecutor that he cooperated. *See Govt. Ex. O at 127*. And finally, Floyd told the defendant: "[w]e want you to tell us the truth.... So just like we told you, we can't promise you anything, so that we can tell the judge and the defense attorney and the United States attorney that you finally, finally told us the truth." *See Govt. Ex. O at 147*.

### 2. *Conclusions of Law*

 The Court concludes that the government has shown by a preponderance of the evidence that the statements made by the defendant at the January 22, 1999 interview were voluntary. In reaching this conclusion, the Court took into account the totality of the circumstances. There is no evidence of any coercive police tactics or overreaching on the part of law enforcement. The interview was conducted by three members of law enforcement agents with no more than two questioning him at one time. The interview took place at the Smith County building, and there is nothing to suggest that the setting or length of the interview was in any way coercive.

There were no improper promises of leniency that render the defendant's statements involuntary. At no time was the defendant promised anything in exchange for his statements. Floyd's representation that he would communicate to the government that he had been cooperative is not impermissible. Likewise, encouraging the defendant to be honest is not so coercive as to render the defendant's incriminating statements involuntary. *See Nguyen*, 155 F.3d at 1223; *see also Ballard*, 586 F.2d at 1063.

Moreover, there is nothing to indicate that the defendant's will was overborne by the circumstances attendant to the interview. Food, drink, bathroom breaks and cigarettes were made available to the defendant. He was not shackled or restrained in any way. The defendant was advised of his rights prior to the commencement of questioning and he, therefore, knew that he was entitled to counsel, that he was not required to talk to them and that his statements could be used against him. His prior dealings with law enforcement further supports the position that he was familiar with and understood his rights. He was aware of the egregious nature of the charges at issue and knew that he was considered a suspect. That the defendant invited future communication with Floyd further supports the Court's conclusion that his statements were voluntarily made.

The Court also concludes that the defendant effectively waived his Fifth Amendment rights. The government has proven by a preponderance of the evidence that the defendant, after being advised of his rights, made an uncoerced choice to waive those rights with the requisite level of comprehension as to the consequences. Partially through the interview, the agent again broached the subject of his Fifth Amendment rights and the defendant reiterated that he understood his rights.

### E. *Jailhouse Confessions*

#### 1. *Finding of Facts*

On January 19, 1999, the F.B.I. received a telephone call from the wife of a Smith

County Jail inmate named John Wesley Walsh. Mrs. Walsh advised the F.B.I. that her husband told her he had information relevant to the Robert Ely and Ronnie Ritch murders. Tr. 195; 247.

Texas Ranger Randy Prince and F.B.I. Special Agent Carruth met with Walsh at the Smith County Sheriff's Department that afternoon. Tr. 195. The interview was recorded and a transcript of the conversation was later made. Tr. 196–97.

Walsh explained that he and the defendant had been placed in the same tank[4] at the Smith County Jail. Tr. 226. Walsh stated that the defendant approached him in the jail law library and asked to read Walsh's appellate case.[5] Tr. 229. Later that evening, when they returned to the tank, the defendant again approached Walsh, who was in his cell. Tr. 230. The defendant inquired about Walsh's case and implicated himself and Charles Stephens in the murders of Ronnie Ritch and Robert Ely. Tr. 197; 230–31. Walsh terminated the conversation out of a fear of potential criminal responsibility. Tr. 232–34; 250.

Carruth and Prince told Walsh not to initiate conversation or question the defendant any further about the crimes. Tr. 198, 234; 240.

The defendant approached Walsh again that evening. Tr. 234. The defendant discussed the possibility of avoiding the death penalty for capital crimes. Tr. 235; 236. The defendant told Walsh that he blindfolded the banker with his tie, that he took personal property from the victims and that he burned that property behind his house. Tr. 201.

Prince and Carruth again met with Walsh in the Smith County Grand Jury Room[6] on January 20, 1999. Tr. 199; 235. Walsh agreed to wear a recording device and signed a written authorizations to that effect. Tr. 200; 236; 248.

On January 20, 1999, the defendant again approached Walsh. Tr. 203; 237. Walsh suggested that they go to the library, where unbeknownst to the defendant, the F.B.I. had set up video recording equipment. Tr. 203; 237. The discussion between Walsh and the defendant was captured on video, but the audio recording failed. Both Walsh and the defendant drew on a piece of paper at the meeting. The defendant told Walsh specific details about the murders and drew a map. Tr. 238. The defendant gave Walsh the map and told him to use it to come up with a good story. Tr. 238.

That night, the defendant approached Walsh several times to discuss his case. Tr. 240.

Prince and Carruth debriefed Walsh at the Smith County Sheriff's Department the next day, January 21, 1999. Tr. 204. This meeting was also videotaped. Tr. 204; 205–6. Walsh gave them the map prepared by the defendant the previous day. Tr. 206.

### 2. Conclusions of Law

 The Court concludes that the government has shown by a preponderance of the evidence that the jailhouse statements made by the defendant were voluntarily made. In reaching this conclusion, the Court took into account the totality of the circumstances. There is no evidence before the Court of any coercive tactics or overreaching on the part of law enforce-

---

4. A Smith County Jail tank is comprised of eight cells with a common day room. Tr. 226.

5. There was a perception in jail that Walsh had beaten a murder charge. Tr. 197–98; 230. In fact, Walsh was convicted of murder and was sentenced to twenty years in prison for his involvement of the murder of Martin

Aguirre following a game of pool. *See Walsh v. State of Texas,* 658 S.W.2d 285 (Tex.App.—Fort Worth 1983).

6. They met at a different location out of concerns for Walsh's safety. Tr. 199. He could be transported to and from the Grand Jury Room without being observed. Tr.199.

ment to elicit the statements. Moreover, there is nothing to indicate that the defendant's will was overborne by the circumstances attendant to his conversations with Walsh. To the contrary, it was the defendant who repeatedly sought Walsh out, seeking his legal assistance. As such, the defendant was free to terminate the conversation with Walsh at any time. There is nothing to suggest that the defendant was intimated by Walsh or felt compelled to give his statements. Likewise, there is no evidence before the Court that the defendant gave the information in exchange prison protection.

■■■ The Court also concludes that the defendant was not entitled to be Mirandized prior to the conversations. "It is the premise of Miranda that the danger of coercion results from the interaction of custody and official interrogation." *See Illinois v. Perkins*, 496 U.S. at 296, 110 S.Ct. 2394. "Conversations between suspects and undercover agents do not implicate the concerns underlying Miranda." *See Perkins*, 496 U.S. at 296, 110 S.Ct. 2394. Rather, "[c]oercion is determined from the perspective of the suspect." *Id.* "[P]olice dominated atmosphere and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate." *Id.* This is so because "[w]hen a suspect considers himself in the company of cellmates and not officers, the coercive atmosphere is lacking." *Id.* "[W]here a suspect does not know that he is conversing with a government agent, these pressures do not exist." *Id.* " '[W]hen the agent carries neither badge nor gun and wear not "police blue," but the same prison grey' as the suspect, there is no 'interplay between police interrogation and police custody.' " *Id.* "Miranda forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust in one he supposes to be a fellow prisoner." *Id.*

■■■ The Court also concludes the defendant's Sixth Amendment right to counsel was not violated by the jailhouse conversations. The Sixth Amendment right does not attach until adverse criminal judicial proceedings have been initiated. *See United States v. Walker*, 148 F.3d 518, 528(5th Cir.1998); *see also Moran*, 475 U.S. at 413, 106 S.Ct. 1135. "Sixth Amendment protections are offense specific." *Id.* The defendant had no Sixth Amendment rights to counsel at the time of the jailhouse confessions because adverse criminal proceedings had not been commenced.

## V. CONCLUSION

In conclusion, the Court finds that the defendant's Fifth Amendment rights were not violated, that the defendant's statement are admissible, and that his *Motion to Suppress Statements of Kenneth A. Tatum* [Clerk's Docket No. 364] and *Motion to Suppress Statements of Kenneth A. Tatum to John Wesley Walsh* [Clerk's Docket No. 363] should be in all things denied.