# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-1952

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Jeffrey Lynn Miller, also known as | * | |
| Randy Arthur Smith, also known as | * | |
| Randy Arthur Smith, Jr., also known | * | |
| as Manson, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: December 10, 2001

Filed: March 5, 2002

_____

Before WOLLMAN,[1] Chief Judge, HANSEN, Circuit Judge, and FENNER,[2] District
Judge.

_____

WOLLMAN, Chief Judge.

_____

[1]The Honorable Roger L. Wollman stepped down as Chief Judge of the United
States Court of Appeals for the Eighth Circuit at the close of business on January 31,
2002. He has been succeeded by the Honorable David R. Hansen.

[2]The Honorable Gary A. Fenner, United States District Judge for the Western
District of Missouri, sitting by designation.

Jeffrey Lynn Miller appeals from the judgment entered by the district court[3] on his convictions of various drug crimes, including killing another person with a firearm during a drug trafficking crime. We affirm.

## I. BACKGROUND

Taken in the light most favorable to the verdict, the evidence established the following.

From March to June of 1999, Miller and Deon Jackson, both originally from Detroit, worked in a partnership selling crack cocaine in Minneapolis, Minnesota. They acquired crack by buying it and by stealing it from other drug dealers. In the course of their business, they used drug addicts as drivers, trading crack for rides in their cars. They also used the apartment of another customer as a base of operation. Miller and Jackson shared one gun, a chrome .45 caliber semiautomatic handgun. Most often, Miller carried the gun and acted as the lookout/enforcer while Jackson dealt with the customers.

Several of their customers testified that they bought approximately one gram of cocaine a day and that they bought primarily from Miller and Jackson. Others testified that they saw Miller and Jackson with a large plastic bag filled with rocks of cocaine and another large rock of cocaine in their possession. The customers testified that they communicated with Miller and Jackson by calling their pagers and using codes to describe how much cocaine they wanted to buy.

On one occasion, Miller and Jackson broke into an apartment looking for drug money they believed was there. Miller threatened Deanna Wiherski, whose boyfriend

---

[3]The Honorable Donovan W. Frank, United States District Judge for the District of Minnesota.

was a drug dealer, with the chrome handgun so that she would not call the police to report the attempted theft. Miller used the same handgun to rob another drug dealer, Kevin Chatman, of money.

In late May 1999, Miller and Jackson borrowed a black Mazda Protege from Victor Diaz to use in their drug business. On the afternoon of June 2, 1999, Miller, Mario Phillips, James Willis, and another man took the Mazda to a restaurant in north Minneapolis. Phillips borrowed the chrome handgun from Miller and used it to rob Steven Gant of some cocaine. After Phillips returned to the Mazda, Miller took the gun back and chased Gant into a nearby store to steal any money that Gant had. Miller and his companions then left in the Mazda. Miller demanded that Phillips give him half of the drugs he had stolen from Gant because Phillips had used Miller's gun to commit the robbery. Phillips refused, and he and Miller argued about this in the car and after they arrived at a house in north Minneapolis. During this argument, Miller waved the gun around. When Ernest Knox, a friend of Phillips, entered the room they were in, Miller pointed the gun at him and demanded to know who he was.

Miller, Jackson, Phillips and Willis left the house and got into the Mazda to travel to another house to complete a drug deal with Knox, who followed them in his vehicle but lost track of the Mazda. Miller, who was driving, and Phillips continued to argue about whether Miller should get some of the drugs Phillips had stolen from Gant, with Miller pointing the gun at Phillips. Miller stopped the car, and the two men continued the argument on the street. This argument was witnessed by a local resident, Andrew Clipperton, who called 911 and described the situation as it was happening. Although Clipperton could not identify any of the men's faces, he reported to the 911 operator that the man with the gun was wearing a dark, striped shirt. All four men got back in the car. Instead of driving, Miller sat behind Phillips, who was in the front passenger seat. Jackson sat next to Miller, and Willis drove. Miller told Willis to turn down an alley. Shortly after Willis turned into the alley,

Miller reached up and shot Phillips, the bullet entering his left shoulder and coming to rest in his right lung, resulting in his death within minutes.

Although Willis did not see who had the gun, he saw the gun coming up between the seats and heard the shot. He opened the door, jumped out, and ran away. Jackson testified that upon seeing Miller shoot Phillips he also jumped out of the car and ran away. Testifying in his own behalf, Miller stated that Willis was not even in the car when the shooting took place and that Jackson shot Phillips while the car was stopped and as Miller was about to get into the driver's seat.

Following the shooting, Jackson ran back to the home that they had just left. Miller called the house several times. Approximately an hour later, he came to the house and Jackson left with him. Phillips's body, covered up with clothing, was lying in the passenger seat, which had been placed in a reclining position. Miller drove to a railroad yard in a wooded area of St. Paul, where the Mazda became stuck in sand on a service road. As Miller and Jackson were trying to push the car free, a railroad security officer who had seen them drive into the yard approached, whereupon the two ran away into some woods. According to the security officer's testimony, Jackson was wearing a dark, striped shirt and Miller a white t-shirt.

During the flight from the railroad yard, Jackson removed his shirt and threw it away in the woods. The two men emerged in a residential area and managed to secure a ride out of the neighborhood. Jackson and Miller finally returned to the house in north Minneapolis later that evening. Jackson appeared nervous and told his girlfriend that he had done something bad that could land him in prison. Miller appeared calm, at least by comparison. Both men packed some clothes and left shortly thereafter. They flew to Detroit on separate flights the following day. Miller turned himself in to the FBI in Detroit on July 26, 1996, after learning that he was being sought. Jackson was arrested in Detroit in February 2000 on an unrelated offense.

Both Jackson and Miller were indicted on seven drug-related charges. In addition, Miller was indicted on a count of being a felon in possession of a firearm. Willis was indicted separately on a single drug charge. Both Willis and Jackson pled guilty in exchange for their testimony against Miller.

The evidence presented at trial indicated that blood spatter covered the front passenger area of the car. The medical examiner testified that Phillips's wound could have spurted blood for several minutes after he was shot. The chrome .45 caliber handgun was on the floor behind the front passenger seat, and a single spent shell casing for a .45 caliber weapon was lying on the back seat. Bullet fragments recovered from Phillips's body were fired from the handgun found in the car.

## II. DISCUSSION

### A. Sufficiency of the Evidence

Miller contends that the evidence was insufficient to convict him on any of the charges. In reviewing such a challenge, we will uphold a conviction when, viewing the evidence in the light most favorable to the verdict, a reasonable jury could conclude that the defendant was guilty beyond a reasonable doubt. United States v. Echols, 144 F.3d 584, 585 (8th Cir. 1998).

Count I alleged that Miller and Jackson engaged in a conspiracy to possess with intent to distribute and to distribute drugs in violation of 21 U.S.C.A. § 846 (West 1999). Jackson testified regarding this conspiracy, and numerous other witnesses testified that they had purchased drugs from Jackson and Miller and had observed them selling drugs. There was testimony that Miller and Jackson engaged in robbery, burglary, and assault in order to get drugs and money for their business. The credibility of these witnesses was for the jury to determine, Echols, 144 F.3d at 585, and thus the evidence amply supported the jury's verdict on this count.

-5-

Count II alleged that Miller and Jackson knowingly possessed, used and carried a firearm during and in relation to a drug trafficking crime, namely, the conspiracy charged in Count I, a violation of 18 U.S.C.A. § 924(c)(1) (West 2000), and that they aided and abetted each other in this crime in violation of 18 U.S.C.A. § 2 (West 2000). Several witnesses testified that they observed Miller and Jackson carrying and using the chrome handgun during the course of the drug conspiracy, and so Miller's challenge to the sufficiency of the evidence on this count fails.

Count III alleged the same crime as Count II, but this time as to a specific occurrence on May 19, 1999, when Miller and Jackson used the gun in their attempted burglary of Deanna Wiherski's home. Miller argues that the government did not prove that the burglary was a drug trafficking crime. Jackson testified, however, that the money they were looking for was "drug money," and there was other evidence that Jackson and Miller robbed people of money to further their drug business. Thus, there was ample evidence to support the jury's verdict as well.

Count IV alleged another specific instance of the crime in Count II, when on June 2, 1999, Phillips and Miller robbed Gant of drugs. Miller argues that Phillips committed this robbery on the "spur of the moment" and that he did not know that Phillips was planning the robbery when he gave him the gun. Gant, however, testified that Miller chased him with the gun, and Willis testified that Miller took the gun and went after Gant in search of any money that Phillips might have missed. Miller then drove himself and Phillips away from the scene. Accordingly, the jury's verdict on this count finds ample support in the evidence.

Count V alleged that Miller, a convicted felon, knowingly and intentionally possessed, in and affecting interstate commerce, a firearm, on or about June 2, 1999, in violation of 18 U.S.C.A. § 922(g)(1) (West 2000). There is no dispute that Miller had a prior felony conviction, and several witnesses testified that Miller had the

chrome handgun on that day. Thus, there is ample evidence that Miller was guilty of this crime.

Count VI alleged that Miller and Jackson knowingly and intentionally conspired with each other to possess, carry, and use a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C.A. § 924(o) (West 2000). As described above, however, there is ample evidence that Miller and Jackson were engaged in a drug conspiracy and that each possessed and used the gun.

Counts VII and VIII related to the murder of Mario Phillips. These counts alleged that Jackson and Miller knowingly possessed, used and carried a firearm during and in relation to a drug trafficking crime and in the course of this violation caused the death of a person through the use of the firearm, in violation of 18 U.S.C.A. § 924(j) (West 2000), and that they aided and abetted each other in doing so. These counts are identical, except that Count VIII includes the assertion that the two acted with malice aforethought. Thus, Count VIII charged first degree murder, and Count VII charged the lesser included offense of second degree murder.

Miller challenges the sufficiency of the evidence to support the jury's verdict on both Count VII and VIII. He contends that Andrew Clipperton's testimony and the tape of Clipperton's 911 call establish that it was Jackson, not Miller, who was the shooter. In the 911 call, Clipperton describes the person with the gun as wearing a striped shirt. There is no dispute that Jackson was wearing such a shirt and that Miller was wearing a white t-shirt when the two were confronted by the security officer at the railroad yard. Miller testified that he was wearing a white t-shirt before the shooting. Although another witness testified that Miller might have been wearing a white t-shirt before the shooting, this witness acknowledged that he was not focusing on what everybody was wearing at the time. Jackson testified that Miller was wearing a striped shirt. The government argued to the jury that Miller had ample

time--nearly an hour--to change his shirt after the shooting and that he likely would have done so because his shirt he was wearing at the time of the shooting would have had blood on it. Moreover, Clipperton did not witness the shooting itself, and so his testimony regarding the description of the person who was holding the gun while the four men argued outside the car is not conclusive on the question of who was wielding the weapon at the time the fatal shot was fired. Viewing the evidence in the light most favorable to the verdict, we conclude that a rational jury could have found from this conflicting evidence that it was Miller who shot Phillips. Thus, we reject Miller's challenge to the sufficiency of the evidence on the murder counts. We note that at sentencing the district court twice stated that in its view the evidence established that it was Miller who fired the fatal shot.

In any event, the jury could rationally conclude that Miller aided and abetted the shooting and so was guilty of the charged offense. Federal law makes no distinctions in the level of guilt as between the principal offender and one who aids and abets him. 18 U.S.C.A. § 2 (West 2000); United States v. Simpson, 979 F.2d 1282, 1285 (8th Cir. 1992). The district court instructed the jury that it could find Miller guilty either as a principal or as an aider and abetter. The evidence established that if Miller was not the shooter, then without doubt his co-conspirator and partner Jackson was. The shooting took place in the car they were in and with the gun that they used in their joint drug trafficking enterprise. Miller possessed the gun during his argument with Phillips at the house before they got into the car, and thus he would have had to give it to Jackson to enable Jackson to shoot Phillips, clearly an act of aiding and abetting.

In summary, because the record contains sufficient evidence to support Miller's conviction on all counts, we affirm his convictions on all counts.

## B.  Sentencing Issue

The district court sentenced Miller to life imprisonment on the murder counts. Miller argues that his sentence should be reduced because at most he only aided and abetted Jackson in committing the murder.  Even if we accepted Miller's arguments that he was not the shooter, he would not be entitled to a lesser sentence.  The Sentencing Guidelines provide that aiders and abetters receive the same offense level as if convicted as a principal, U.S.S.G. § 2X2.1 (2001), and there is not a shred of evidence that would support a mitigating role reduction under U.S.S.G. § 3B1.2.  Thus, we reject his plea that the case be remanded for resentencing.

## C.  Constitutional Challenge

Miller contends that his convictions under 18 U.S.C. §§ 924(c), (j), and (o) for Counts II, III, IV, VI, VII, and VIII all violate the Commerce Clause of the United States Constitution.  These statutory sections concern the possession of drugs and/or use of a firearm in connection with a drug trafficking crime.  Miller claims that there is no proof that his activities substantially affected interstate commerce, and so under United States v. Lopez, 514 U.S. 549 (1995), Congress has no power to regulate his activities.  We rejected a similar argument in United States v. Bell, 90 F.3d 318, 320-21 (8th Cir. 1996), and thus Miller's attack on the challenged convictions fails.  Because Congress may regulate drug trafficking, it may also regulate the use of firearms connected with that trafficking.  Id. at 321.  Thus, the activities proscribed by 18 U.S.C. §§ 924(c), (j), and (o) have a sufficient connection to interstate commerce to fall within Congress's Commerce Clause power.  See United States v. Nguyen, 155 F.3d 1219, 1227 (10th Cir. 1998) (18 U.S.C. § 924(j) constitutional where one of the elements was conviction of an armed robbery that affected interstate commerce).

## III. CONCLUSION

The judgment is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-10-