**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 25 2002**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ELLIOT C. TOLES,

Defendant - Appellant.

No. 01-5009

---

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 99-CR-97-C)**

---

Thomas Scott Woodward, First Assistant United States Attorney, (David E. O'Meilia, United States Attorney, with him on the briefs), Tulsa, Oklahoma, for Plaintiff-Appellee.

William D. Lunn, Tulsa, Oklahoma, for Defendant-Appellant.

---

Before **BRISCOE** and **MURPHY**, Circuit Judges, and **VAN BEBBER**, Senior District Judge[*].

---

**MURPHY**, Circuit Judge.

---

[*]The Honorable G. Thomas Van Bebber, Senior District Judge, United States District Court for the District of Kansas, sitting by designation.

## I. INTRODUCTION

Defendant-Appellant Elliot C. Toles was charged with various offenses in Tulsa, Oklahoma in a superceding indictment. At the conclusion of a jury trial, Toles was found guilty of multiple counts each of interference with interstate commerce, using or brandishing a firearm during a crime of violence, and bank robbery. In addition, he was convicted of aiding and abetting in connection with each of the above offenses. On appeal, Toles argues that (1) police investigators obtained incriminating statements from him in violation of the Fifth and Sixth Amendments; (2) the district court's restriction on the cross-examination of a witness violated his Confrontation Clause rights; (3) there was insufficient evidence to sustain his convictions under the Hobbs Act and 18 U.S.C. § 924(c); (4) the prosecutor's improper remarks during closing statements constituted reversible error; and (5) there was cumulative error. We exercise jurisdiction under 28 U.S.C. § 1291 and **affirm**.

## II. BACKGROUND

During the evening hours of June 30, 1999, Toles was arrested with DeMarques Morris and Sh-Pone Harris in connection with an armed robbery of a Burger King restaurant in Wichita, Kansas. Toles was taken to the FBI building

in Wichita.  FBI Special Agent Randy Ewy and Sergeant Michael Hennessy of the Wichita Police Department interviewed Toles for several hours into the early hours of July 1.   After signing a waiver of rights, Toles mentioned other robberies in Kansas and Oklahoma.  After this first interview, Toles was taken to the Sedgwick County Adult Detention Facility ("SCADF") to spend the night.

Sometime prior to July 2, 1999, Toles was formally charged for his participation in the Kansas robberies.[1]  He was represented by counsel in that matter.  On July 2, Wichita Police Department Detective Steven Nevil, on assignment with the FBI Violent Crime Task Force, and FBI Special Agent Pritchett accompanied Toles to a scheduled court appearance on the Kansas charges.  At the Wichita federal courthouse, Pritchett told Nevil that Toles wanted to speak with Nevil.   Nevil and Pritchett escorted Toles to a restroom.  After signing a waiver of rights form, Toles indicated that he was responsible for the robberies of a tag agency[2] and a bank in Tulsa.  The interview in the bathroom was cut short by Toles' scheduled court appearance, but Nevil had at some point

---

[1]Toles was eventually tried and convicted of the Kansas crimes in federal court.  In a prior appeal from the Kansas convictions, this court denied Toles' constitutional challenge to the Hobbs Act as exceeding Congress' power to regulate under the Commerce Clause. *See United States v. Toles*, No. 00-3012, 2001 WL 314523, at **1 (10th Cir. Apr. 2, 2001).

[2]A tag agency produces driver's licenses and state identification cards.  It also sells vehicle tags, which function as a license tax, and pike passes, which permit Oklahoma and out-of-state residents to drive on Oklahoma toll roads.

given Toles a business card and stated that he could call Nevil collect at the FBI if he had anything further to discuss.

A few hours after the arraignment, Toles placed a collect call from the SCADF to Detective Nevil. After Nevil arranged a meeting with Toles at the SCADF and advised him of his rights, Toles made statements implicating himself in four robberies in Tulsa, the indicted charges in this case. Toles further stated that a fake beard and mustache and a note were used during one of the robberies.

Toles was indicted and tried with co-defendant Morris for the robberies of the Northside Tag Agency, a Homeland grocery store, and branches of the Bank of Oklahoma and the American State Bank. At trial, Harris testified as a government witness pursuant to a grant of use immunity. The district court did not permit Toles to cross-examine Harris about the details of a plea agreement Harris had entered into in the Kansas prosecution. Toles was found guilty of two counts of violating the Hobbs Act, 18 U.S.C. § 1951, two counts of 18 U.S.C. § 924(c), and two counts of bank robbery, 18 U.S.C. § 2113(a).[3]

---

[3]Morris was also found guilty of multiple offenses and brought a separate appeal of those convictions. *See United States v. Morris*, No. 99-CR-97-C (D. Kan. Dec. 11, 2000), *appeal docketed*, No. 00-5255 (10th Cir. Jan. 19, 2001).

## III.  DISCUSSION

### A.  Motion to Suppress Incriminating Statements

Toles argues that the district court's refusal to suppress his post-arrest statements, in which he incriminated himself in the Oklahoma robberies, violated his Fifth and Sixth Amendment rights.  Specifically, Toles alleges that two separate discussions with FBI agents on July 2 violated his Sixth Amendment right to counsel because Toles had already been formally charged and was represented by counsel.  He further alleges that the statements were not voluntarily given, in violation of the Fifth Amendment.  After conducting an evidentiary hearing, the district court denied Toles' motions to suppress.

#### 1.  Sixth Amendment Right to Counsel

In reviewing the district court's order granting or denying a motion to suppress, this court accepts the district court's factual findings unless clearly erroneous and considers the evidence in the light most favorable to the district court's determination.  *United States v. Caro*, 248 F.3d 1240, 1243 (10th Cir. 2001).  "We are mindful that at a hearing on a motion to suppress, the credibility of the witnesses and the weight given to the evidence, as well as the inferences and conclusions drawn therefrom, are matters for the trial judge." *Id.* (quotation omitted).

A defendant's Sixth Amendment right to counsel attaches when formal judicial proceedings, such as a formal charge, preliminary hearing, indictment, information, or arraignment, have been initiated against him. *See United States v. Gouveia*, 467 U.S. 180, 187-88 (1984). The Sixth Amendment right to counsel, however, is offense-specific and does not prevent law enforcement from questioning a defendant about unrelated or uncharged criminal activity. *See McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991).[4]

In this case, Toles had been charged for the Kansas crimes at the time he gave both July 2 statements, but formal criminal proceedings had not been brought against him for the Oklahoma crimes. Thus, Toles' Sixth Amendment right to counsel had not attached with respect to the unindicted Oklahoma crimes.

2. Voluntariness of Incriminating Statements

Toles also alleges that the two statements he gave to Detective Nevil on July 2, 1999 were involuntary, in violation of his Fifth Amendment due process rights. He argues that the incriminating statement he gave to law enforcement in a courthouse restroom before his arraignment on the Kansas crimes was the result

---

[4]The Supreme Court has recently created a narrow exception to *McNeil* by holding that the Sixth Amendment right to counsel also attaches to uncharged offenses that would be considered the "same offense" under *Blockburger v. United States*, 284 U.S. 299 (1932). *See Texas v. Cobb*, 532 U.S. 162, 173 (2001). The parties do not cite *Texas v. Cobb*, or otherwise argue that the exception it created applies in the instant case.

of law enforcement's high-pressure tactics, Toles' lack of sleep in the preceding forty-eight hours, and his youth and limited intelligence.[5]

This court reviews *de novo* the voluntariness of a statement, although specific underlying findings of fact are reviewed for clear error. *See United States v. Gonzales*, 164 F.3d 1285, 1289 (10th Cir. 1999). When the government obtains incriminating statements through acts, threats, or promises which cause the defendant's will to be overborne, it violates the defendant's Fifth Amendment rights and the statements are inadmissible at trial as evidence of guilt. *See United States v. Glover*, 104 F.3d 1570, 1579 (10th Cir. 1997) (citing *Malloy v. Hogan*, 378 U.S. 1, 7 (1964)). The determination of voluntariness is based on the totality of circumstances. *Gonzales*, 164 F.3d at 1289. Relevant circumstances embrace both the characteristics of the accused and the details of the interrogation. *Id.* (quotation omitted). Such factors include (1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subjected to physical punishment. *Glover*, 104 F.3d at 1579 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).

---

[5]Toles also claims that his subsequent incriminating statement to Detective Nevil at the SCADF was nothing more than a continuation of the earlier interview at the courthouse. By the time Nevil spoke to Toles at the SCADF, however, several hours had elapsed since the interview in the courthouse bathroom. The passage of time alone undercuts his argument and we review them as separate incidents.

After reviewing the entire record, this court concludes that Toles' statements on July 2 were freely and voluntarily given. At both the bathroom and SCADF interviews, Toles was advised of his constitutional rights and in each instance he signed a written waiver of rights. Although Toles alleges that the agents did not inform him about the nature of the charges against him and their consequences, a defendant's confession is not coerced merely because law enforcement did not inform the defendant of all the potential charges that could be brought. *See United States v. Nguyen*, 155 F.3d 1219, 1222 (10th Cir. 1998).

In both instances, Toles was lucid and responsive to questioning. Toles concedes that there was no evidence of the use or threat of physical punishment. At the time of the interviews, Toles was twenty-one and had completed the ninth grade prior to receiving his Graduate Equivalency Diploma while incarcerated for other crimes. Detective Nevil testified at trial that, based on his interactions with Toles, nothing suggested that he had a limited intelligence. Moreover, Toles had previously been convicted of a felony, indicating that he had previous experience with the criminal justice system. Thus, there is no evidence indicating that Toles was "unusually susceptible to coercion because of age, lack of education, or intelligence." *Id.* at 1222 (quotation omitted).

Furthermore, the district court's finding that there was no evidence of any threat, coercion, undue influence, or promise made in exchange for Toles'

statements is not clearly erroneous. Detective Nevil testified that he did not make any promises to Toles in the courthouse restroom. Indeed, Nevil testified at trial that it was Toles who broached the subject of the Oklahoma crimes. Although Toles testified that he made the bathroom statement after discussing the benefits of cooperation and the possibility of having all the charges run concurrently, the district court's determination necessarily meant that it credited Nevil's testimony and discounted Toles'. Detective Nevil also testified it was possible that Agent Pritchett, who was present at the bathroom interview, discussed with Toles the consequences of cooperation. Pritchett did not testify at the suppression hearing or at trial. The possibility that Pritchett *may* have discussed the benefits of cooperation with Toles does not render his statements involuntary. *Cf. Nguyen*, 155 F.3d at 1222 (explaining that agent's testimony that another agent *may* have agreed to inform the prosecutor of the defendant's cooperation did not coerce the defendant's statement).

Toles' SCADF statement was also given voluntarily. Toles initiated contact with Nevil to discuss the Oklahoma robberies. *Cf. United States v. Fountain*, 776 F.2d 878, 885 (10th Cir. 1985) (noting that defendant's initiation of contact with law enforcement is a factor in the voluntariness of statement). At the SCADF, Nevil reminded Toles that he had counsel and could have counsel available if he so wanted, but Toles did not request counsel's presence. Although

Nevil acknowledged that he discussed the possibility of consolidation with Toles, it was Toles who raised the topic. Moreover, Nevil explained to Toles that any transfer of charges pursuant to Rule 20 of the Federal Rules of Criminal Procedure must be initiated by defense counsel and "wasn't something that the government is responsible for setting in motion." Nevil specifically suggested that Toles speak to his attorney if he wanted a more detailed explanation of the procedure or wished to pursue consolidation, but Toles did not seek the advice of counsel before giving an incriminating statement. Viewing the evidence in the light most favorable to the government, we agree with the district court that Toles' incriminating statements were voluntary.

## B. Limitation on Cross-Examination of Sh-Pone Harris

Toles next contends that limitations on his cross-examination of Harris violated his Confrontation Clause rights under the Sixth Amendment. Harris testified at trial after the government granted him use immunity. During the trial, Toles attempted to cross-examine Harris about the details of a plea agreement Harris had entered into in the Kansas criminal case. The government, however, argued that the plea agreement was made in another jurisdiction, was not binding on Harris in this case, and was therefore irrelevant. Under cross-examination by co-defendant Morris, Harris stated that he was not testifying because of the plea agreement in Kansas. Based on that testimony, the district court did not allow

Toles to cross-examine Harris about the contents of the plea agreement. The district court stated that the contents of the plea agreement were irrelevant because Harris had already stated that his testimony was not pursuant to the plea agreement and because the Kansas plea agreement "has no relationship to this case."

This court reviews *de novo* whether cross-examination restrictions violate a defendant's Sixth Amendment right to confrontation. *United States v. McGuire*, 200 F.3d 668, 677 (10th Cir. 1999). "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (quotation omitted). Although the trial court has wide discretion to impose reasonable limits on the scope of cross-examination, "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Id*. at 678-79 (quotation omitted). A defendant's Confrontation Clause rights are violated when he is prohibited from engaging in otherwise appropriate cross-examination designed to elicit the witness' bias and a reasonable jury might have received a significantly different impression of the witness' credibility. *See id.* at 680.

The parties dispute whether Harris' plea agreement in a federal Kansas court is binding on him in a federal court in Oklahoma. This court has not previously addressed the issue of whether a plea agreement made in one jurisdiction is binding on a defendant in another jurisdiction, and need not resolve it in this case.

Even if the Kansas plea agreement were binding on Harris in Oklahoma and the limitation on the cross-examination of Harris violated Toles' Confrontation Clause rights, the limitation is subject to harmless error review. *See United States v. DeSoto*, 950 F.2d 626, 630 (10th Cir. 1991) (citing *Chapman v. California*, 386 U.S. 18, 22 (1967)); *see also Van Arsdall*, 475 U.S. at 684. In conducting a harmless error review, this court determines whether the error was harmless beyond a reasonable doubt. *See Van Arsdall*, 475 U.S. at 684. Among the factors to consider are the importance of the witness' testimony in the prosecution's case, the cumulative nature of the testimony, the presence or absence of corroborating or contradictory testimony, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case. *Id.*

In this case, the record contains ample evidence of Toles' guilt. Detective Nevil testified that Toles confessed to each of the four robberies charged in this case and provided details about the location of certain robberies, the amounts taken, and his role as a getaway driver. These details were consistent with the

details provided in DeMarques Morris' confession to Detective Nevil on July 2 at the SCADF. Toles also indicated that a note and a fake beard and mustache were used in one of the bank robberies, which is corroborated by Morris' confession and the testimony of Dekisha Verner, a bank teller at the American State Bank robbery.

Furthermore, Toles' cross-examination of Harris was circumscribed only as to the Kansas plea agreement. Although the jury did not hear testimony about the contents of the agreement, it heard Toles elicit testimony from Harris about its existence. Toles conducted extensive cross-examination of Harris about the statements Harris gave to law enforcement and the conversations he had with Toles and Morris about the robberies. The jury was able to witness Harris' demeanor and assess his credibility.

In addition, the possibility that Harris was biased in favor of the government is mitigated by the fact that he was granted use immunity for his trial testimony. Harris testified that he understood he could be held in criminal contempt if he refused to testify or gave false testimony. Thus, even if the jury had heard testimony that the government gave Harris favorable treatment under the Kansas plea agreement, the potential bias from such treatment is mitigated by the specter of criminal contempt charges against Harris.

Finally, the government's case against Toles was strong even without the testimony of Harris, who was the only witness who testified about Toles' direct involvement in certain robberies. Given Toles' and Morris' confessions, as well as the corroborating evidence of the other testifying witnesses, this court is satisfied that the limitation on the cross-examination of Harris was harmless beyond a reasonable doubt.

## C. Sufficiency of Evidence Claims

This court reviews the sufficiency of evidence *de novo*. *See United States v. Malone*, 222 F.3d 1286, 1290 (10th Cir. 2000). We do so, however, "viewing the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the government. We will reverse only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 1290-91 (quotation omitted).

### 1. Hobbs Act Conviction for the Northside Tag Agency Robbery

The Hobbs Act punishes activity that "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do." 18 U.S.C. § 1951(a). The statute defines "commerce" as "all commerce between any point in a State . . . and any point outside thereof; all commerce between points within the same State through any place outside such State." *Id*. § 1951(b)(3). The

Supreme Court has stated that the Hobbs Act "speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence." *Stirone v. United States*, 361 U.S. 212, 215 (1960).

Toles claims that there was insufficient evidence to establish the interstate commerce requirement of the Hobbs Act for the Northside Tag Agency robbery. He concedes that binding precedent in this circuit requires the government to demonstrate only a *de minimis* effect on interstate commerce. *See Malone*, 222 F.3d at 1294-95 (explaining that the Supreme Court's decisions in *United States v. Morrison*, 529 U.S. 598 (2000), and *Jones v. United States*, 529 U.S. 848 (2000), did not affect the *de minimis* standard).

In this circuit, "only a *potential effect* on commerce is required to satisfy the interstate commerce element." *United States v. Wiseman*, 172 F.3d 1196, 1216 (10th Cir. 1999) (emphasis added); *see also United States v. Chanthadara*, 230 F.3d 1237, 1253-54 (10th Cir. 2000) (relying on the depletion of business assets resulting from robbery to find potential effect on interstate commerce); *Nguyen*, 155 F.3d at 1228 (same); *United States v. Zeigler*, 19 F.3d 486, 493 (10th Cir. 1994) (same). *Wiseman*, *Chanthadara*, *Zeigler*, and *Nguyen* stand for the proposition that there need not be a showing of *actual* effect on interstate commerce to satisfy the *de minimis* requirement. *See Nguyen*, 155 F.3d at 1228

(collecting cases from other circuits). In *Wiseman*, for example, we found no error in instructing the jury that the government could satisfy the interstate commerce requirement merely by demonstrating that the stolen funds *could* have been used to purchase goods in interstate commerce. *See* 172 F.3d at 1215-16. This court sees no principled distinction between the purchase of interstate goods in *Zeigler*, *Nguyen*, *Chanthadara*, and *Wiseman*, and the sale of goods, as implicated here. When the affected business sold goods or services, the government can satisfy the *de minimis* requirement by showing that the robbery *could* have decreased the business' sales in interstate commerce.

At trial, Thomas McGee, a clerk at the Northside Tag Agency, testified that the agency sold vehicle tags, which are an annual license tax, and pike passes, which permit Oklahoma and out-of-state residents to drive on Oklahoma toll roads. The tag agency accepts out-of-state checks as payment for tags and driver's licenses. For pike passes, the agency accepts credit cards which are cleared out-of-state. Moreover, McGee testified that out-of-state residents who traveled to Oklahoma could purchase pike passes at the tag agency. The robbers took money from the tag agency, customers, and McGee. As a result of the robbery, the tag agency was closed for the remainder of the day.

Viewing this uncontroverted evidence and the reasonable inferences drawn therefrom in the light most favorable to the government, as we must, a reasonable

jury could conclude that the robbery had a *potential effect* on interstate commerce. It is undisputed that customers were robbed at the tag agency. The tag agency's closure *could* have prevented them from using out-of-state checks and credit cards to purchase pike passes and license tags from the agency. *See Chanthadara*, 230 F.3d at 1253-54 (relying in part on business' revenues from out-of-state credit cards to conclude there was a *de minimis* effect on interstate commerce). The agency's closure also could have prevented potential customers from going to the agency and using out-of-state forms of payment. Moreover, the robbery could have delayed or obstructed sales to out-of-state residents who wished to purchase pike passes. *See United States v. Lotspeich*, 796 F.2d 1268, 1270 (10th Cir. 1986). Indeed, this court concluded in *Lotspeich* that there was a *de minimis* effect by relying in part on evidence that a business had *proposed* to build a racetrack "*with the hope*" of attracting out-of-state customers. *See id.* (emphasis added). There is thus sufficient evidence for a jury to conclude that the closing of the tag agency *could* "in any way or degree obstruct[], delay[], or affect[] commerce." 18 U.S.C. § 1951(a); *see also United States v. Boston*, 718 F.2d 1511, 1516 (10th Cir. 1983) (approving jury instruction requiring government to prove that the defendant "actually *or potentially* obstructed, delayed or affected interstate commerce or attempted to do so" (emphasis added)).[6]

_____

[6]We note that Toles does not challenge the district court's instruction on the Hobbs Act, which included in part:

The dissent acknowledges that the evidence may have permitted the jury to infer "some possibility" that the agency's temporary closure prevented use of out-of-state forms of payment. "[S]ome possibility," however, is apparently less than *de minimis* under the dissent's view and insufficient to establish a potential effect on interstate commerce. The dissent suggests that the government must present evidence which would allow a jury to infer that transactions *regularly* involved out-of-state payments. As the dissent recognizes, however, our cases require only that the government demonstrate a potential effect on interstate commerce. Evidence showing whether and to what extent a business' historic sales derived from out-of-state forms of payments and sales to out-of-state residents is, by definition, unnecessary for a jury to conclude that the robbery *could* have impeded the tag agency's ability to engage in interstate commerce.

Here, there was a realistic possibility that an out-of-state resident who wanted to purchase a pike pass at the Northside Tag Agency could not do so after the robbery. There was also a realistic possibility that one of the customers

---

> If in the case of the Northside Tag Agency, the government proves beyond a reasonable doubt that the Northside Tag Agency provided title and registration transfer services to individuals coming to Oklahoma from outside the State of Oklahoma and/or that the Northside Tag Agency accepted national credit cards in payment, then you are instructed that you may find that such defendant under consideration obstructed, delayed, or affected commerce. . . .

I R. Doc. 99 at 22.

robbed wanted to use an out-of-state check or credit card to purchase a vehicle tag. In convicting Toles of the robbery, the jury necessarily found that there was at least a potential effect on interstate commerce, a finding that was reasonable and supported by the prosecution's uncontroverted evidence. We conclude that the government's evidence was "not so trivial as to automatically place the[] robber[y] beyond the reach of the Act."[7]

2. 18 U.S.C. § 924(c) Convictions

Toles argues that the government's evidence that Toles used a real gun in the Homeland grocery robbery and the tag agency robbery was insufficient for a jury to convict.[8] At trial, Thomas McGee testified that one of the robbers used a "big," "shiny" handgun during the robbery. McGee, who had served in the

---

[7]Toles argues that the tag agency was "a 'state activity' that had nothing to do with 'the large scale buying and selling of goods and services' required to fall under the definition of 'commerce.'" To the extent that Toles raises a purely legal claim that the robbery of a state agency cannot satisfy the "commerce" requirement of the Hobbs Act, this court denies the claim as without merit. That the business robbed in the instant case was a state agency, as opposed to a commercial concern, is of no consequence. The tag agency sold goods—here, tags and pike passes—and accepted payments like any other commercial establishment and was engaged in interstate commerce. The Hobbs Act's prohibition on activity that "*in any way or degree* obstructs, delays, or affects commerce or the movement of *any article or commodity in commerce*" is sufficiently broad to encompass the selling of tags and pike passes. *See* 18 U.S.C. § 1951(a) (emphases added).

[8]In addition, Toles contends that there was no evidence introduced at trial that the guns used moved in or affected interstate commerce. Because 18 U.S.C. § 924(c) does not contain an interstate commerce requirement, Toles' argument is without merit and does not warrant further discussion.

military and had some familiarity with firearms, also testified he had no doubt that the gun was real. On cross-examination, McGee testified that many imitation guns look like real guns and that the robbers did not actually fire the gun.

Similarly, Raymond Crawford, the assistant manager at the Homeland grocery store at the time of the robbery, testified that he had no doubt that the robbers used a real gun. Crawford stated on cross-examination that the gun was not fired or discharged during the robbery and that it was possible that the gun may not have been real.

Viewing this testimony in the light most favorable to the government, a reasonable jury could have concluded that the guns used in the Homeland and tag agency robberies were real.

## D. Government's Closing Remarks

During the government's rebuttal closing statement, the prosecutor stated to the jury:

> [GOVERNMENT:] You know, you come from varied backgrounds. That's very, very important in our system of justice. Mr. McGriff back here with 27 proud years in the park service, and we've got —
>
> [TOLES:] Your Honor, I object to this line — I object to this comment on individual jurors.
>
> THE COURT: Overruled.

[GOVERNMENT:] We've got engineers, computers [sic], people who work in pharmacies, bookkeepers, tailors, administrators, office managers. You all bring collective wisdom. And the Judge is going to tell you use your common sense, use your common sense collectively, work together. Bring your varied backgrounds to this task. The Judge will tell you to use your common sense.

Toles contends that the prosecutor's remarks singling out a juror by name were improper.

Toles also claims that the prosecutor repeatedly misstated the evidence in his closing remarks. Specifically, he contends that the following remarks by the prosecutor were improper: (1) Toles had spoken with Sh-Pone Harris about using a note to commit the robberies; (2) Toles had stated in his confession that the bank robberies were initiated by asking for change; and (3) Toles had asked Harris, who cut Toles' hair, to save the clippings for a disguise in the robberies. Toles made contemporaneous objections to the first two allegedly improper statements, but did not object to the third.

"In some circumstances, prosecutorial misconduct may be so severe that a new trial is required." *United States v. Meienberg*, 263 F.3d 1177, 1180 (10th Cir. 2001). This court reviews *de novo* whether prosecutorial misconduct occurred, which is a mixed question of law and fact. *See United States v. Gabaldon*, 91 F.3d 91, 94 (10th Cir. 1996). If the prosecutor's statement is

-21-

improper, it is harmless unless there is reason to believe that it influenced the jury's verdict. *See id.*

> In assessing whether the misconduct had such an impact, we consider the trial as a whole, including the curative acts of the district court, the extent of the misconduct, and the role of the misconduct within the case . . . [T]o warrant reversal, the misconduct must have been flagrant enough to influence the jury to convict on grounds other than the evidence presented.

*Id.* (quotation omitted).

In this case, the government concedes that it erred in singling out a juror by name during closing arguments. This error, however, was harmless. The district court instructed the jury that the closing statements were not evidence. After Toles objected to the reference, the prosecutor did not repeat the improper remark or mention other jurors by name. Although this court does not condone the prosecutor's remark in this case, the reference was not of a magnitude to warrant reversal of the verdict.

The prosecutor's alleged misstatements of the evidence during the government's closing statements, however, were not improper. All three statements cited by Toles were either ambiguous or were inferences that a jury could have properly drawn from the evidence. *See United States v. Pena*, 930 F.2d 1486, 1490 (10th Cir. 1991) ("[A] prosecutor's summation may appropriately suggest to the jury what inferences it ought to draw from the evidence in the

case."). To the extent that any misstatement of the evidence could have been construed from the prosecutor's statements, they were harmless, or, in the case of the third statement, did not constitute plain error. *See United States v. Hooks*, 780 F.2d 1526, 1532 (10th Cir. 1986).

**E. Cumulative Error**

Finally, Toles claims that even if each of the alleged errors do not rise to the level of reversible error, they collectively constitute cumulative error. A cumulative-error analysis aggregates all errors found to be harmless and "analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *United States v. Rivera*, 900 F.2d 1462, 1470 (10th Cir.1990) (en banc). This court considers whether the defendant's substantial rights were affected by the cumulative effect of the harmless errors. *Id.* Only actual errors are considered in determining whether the defendant's right to a fair trial was violated. *Id.* at 1470-71. If any of the errors being aggregated are constitutional in nature, the cumulative error must be harmless beyond a reasonable doubt, in accordance with *Chapman v. California*, 386 U.S. 18 (1967). *See id.* at 1470 n.6.

In this case, the only errors to be aggregated are the court's limitation on the cross-examination of Sh-Pone Harris, which we merely assumed was error, and the prosecutor's improper reference to an individual juror during closing

arguments. *See* Sections III.B., D., *supra*. After examining the proceedings in their entirety, we cannot say that Toles' right to a fair trial was substantially impaired by the cumulative effect of these errors, assumed and conceded.

Accordingly, this court **AFFIRMS** the Defendant's convictions in all respects.

**No. 01-5009, <u>United States v. Toles</u>**

**BRISCOE**, Circuit Judge, concurring and dissenting:

I concur in the majority's resolution of all of the issues except its affirmance of the Hobbs Act conviction, which I would reverse because of insufficient evidence.

The Hobbs Act provides in relevant part that "[w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery" shall be guilty of an offense against the United States. 18 U.S.C. § 1951(a). This court has repeatedly held, even after the Supreme Court's decision in <u>United States v. Lopez</u>, 514 U.S. 549 (1995), that, to support a conviction under the Hobbs Act, the government must show only that the defendant's acts had a minimal effect on interstate commerce. <u>E.g.</u>, <u>United States v. Chanthadara</u>, 230 F.3d 1237, 1253 (10th Cir. 2000), <u>cert. denied</u>, 122 S. Ct. 457 (2001). For example, this court has held that the required minimal effect on commerce may be established by evidence that the robbery at issue depleted the assets of a business that customarily purchased items in interstate commerce. <u>E.g.</u>, <u>United States v. Nguyen</u>, 155 F.3d 1219, 1224 (10th Cir. 1998).

At the trial in this case, the government presented evidence indicating that the Northside Tag Agency essentially operated as a collection agency for the State of Oklahoma and provided three general types of goods or services to its customers: (1) it made pictures for drivers' licenses and Oklahoma state

identification cards; (2) it sold Oklahoma license plates for all types of vehicles; and (3) it sold passes for the Oklahoma turnpike. As for the details of the robbery, the government presented evidence that Toles and others entered the Agency at approximately 12:05 p.m. on April 1, 1999, and proceeded to take money from the Agency and the Agency's employees and customers. The government's evidence further indicated that, as a result of the robbery, the Agency was forced to close its operations for the afternoon following the robbery.

The government relied on two very limited categories of evidence (both based on the brief testimony of a single witness who worked at the Agency) to attempt to establish that the robbery had the required minimal effect on interstate commerce. First, the government focused on the Agency's customers, presenting testimony that some of the customers had moved to Oklahoma from other states and were seeking Oklahoma tags and drivers' licenses, and that out-of-state residents could purchase Oklahoma turnpike passes. Second, the government presented testimony regarding forms of payment accepted by the Agency -- it accepted major credit cards whose payments were processed out-of-state, and it accepted out-of-state checks for tags and drivers' licenses.

In my view, only the second of these categories has any relation to interstate commerce. The Hobbs Act defines "commerce" as "all commerce between any point in a State . . . and any point outside thereof; all commerce

-2-

between points within the same State through any place outside such State." 18 U.S.C. § 1951(b)(3). The fact that out-of-state residents may have visited the Agency and purchased items does not satisfy this statutory definition. In other words, barring some additional fact (such as use of an out-of-state form of payment), such a transaction would not involve "commerce between any point in a State . . . and any point outside thereof" or "commerce between points within the same State through any place outside such State."[1] In contrast, the Agency's acceptance of major credit cards and out-of-state checks does fall within the statutory definition since it would involve "commerce between points within the same State through any place outside such State."

I further conclude that the government's evidence was insufficient to establish that the robbery had the required minimal effect on interstate commerce. Although we generally allow juries in Hobbs Act cases to draw reasonable inferences from the evidence, the government's evidence here was so limited that the jury, in order to convict Toles, was required to "pil[e] inference on inference." United States v. Sanders, 240 F.3d 1279, 1283 (10th Cir. 2001) (internal quotations omitted). In particular, because there was no evidence as to whether and to what extent the Agency's transactions involved use of credit cards or out-of-state checks, the jury first was required to infer whether and to what extent

---

[1] It appears that the majority does not rely on the out-of-state resident evidence either.

-3-

such forms of payment were used by Agency customers. Only after doing so, and presumably inferring that such forms of payment were regularly used, could the jury have inferred that the forced closure of the Agency following the robbery probably prevented one or more customers from engaging in transactions and using such forms of payment.[2] The mere fact that credit cards or out-of-state checks could be used to purchase goods and services at the Agency does not establish without further evidentiary foundation that they were used.

It is true, as pointed out by the majority, that we previously have stated that the government need only establish a potential or probable, as opposed to an actual, effect on interstate commerce. See Nguyen, 155 F.3d at 1228. In my view, however, the majority takes our previous statements to an unprecedented extreme, suggesting that literally any possibility, even in the absence of any evidence pertaining to the business' past experience, is sufficient to establish the required *de minimis* effect on interstate commerce. This overlooks the fact that other circuits have held, and we seemingly have agreed, that if the government is seeking to establish a probable rather than a direct effect, the government must demonstrate a probability and that the probability was *realistic*. E.g., United

---

[2] In my view, the government could have met its evidentiary burden by either presenting evidence regarding how frequently the Agency accepted out-of-state forms of payment (e.g., regularly), or by presenting evidence that one or more customers in the Agency at the time of the robbery intended to use an out-of-state form of payment.

-4-

States v. Peterson, 236 F.3d 848, 851-52 (7th Cir. 2001) ("We have long held that the government need only show some actual, even if *de minimis*, effect, or, where there is no actual effect, a realistic probability of an effect, on interstate commerce."); United States v. Kaplan, 171 F.3d 1351, 1354 (11th Cir. 1999) (same); Nguyen, 155 F.3d at 1228 (citing cases from other circuits for this proposition); United States v. Buffey, 899 F.2d 1402, 1404 (4th Cir. 1990) ("[B]roadly as the extension of the interstate commerce requirement has spread, we are still a federal, not a unitary, government and, to satisfy the Act, the government still must show that an effect on interstate commerce is reasonably probable."). While the government's evidence may have allowed the jury to infer there was some possibility, however remote, that the temporary closure of the Agency prevented use of out-of-state forms of payment, it was not sufficient to establish that this was a reasonable probability. Instead, as previously noted, the jury could have reached such a conclusion only by piling inference upon inference.

The mere proof that the Agency accepted out-of-state forms of payment is not enough, standing alone, to establish that interstate commerce was affected. In Nguyen and Chanthadara, we did not rely exclusively on the acceptance of out-of-state credit cards to establish the interstate commerce requirement. We also relied on the additional evidence that a percentage of the restaurant's revenues was

generated through the *use* of out-of-state credit cards, that the restaurant purchased goods from several other states, and that sales fell after the robbery. As a result, interstate commerce was affected by the decline in credit card sales and the reduction in purchases from out-of-state vendors.

Finally, it is clear that the government cannot rely on the asset depletion theory utilized in Nguyen and Chanthadara. Under that theory, the robbery of a small amount of money from a business that purchases goods from another state can be deemed to have a sufficient potential aggregate effect on interstate commerce. Here, however, there was no evidence that the Agency itself purchased any items in interstate commerce. Cf. Chanthadara, 230 F.3d at 253 (concluding robbery of restaurant had effect on interstate commerce where robbery forced restaurant to close for twenty-two days and its revenues dropped markedly after it reopened, causing a reduction in the restaurant's out-of-state purchasing).

In sum, the government's evidence was insufficient to support a Hobbs Act conviction. I would reverse Toles' conviction and vacate his sentence on this count.