FILED
United States Court of Appeals
Tenth Circuit

March 3, 2017

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

THOMAS JAMES ZAJAC,

    Defendant - Appellant.

No. 16-4020
(D.C. Nos. 2:12-CV-00355-CW and
2:06-CR-00811-CW-1)
(D. Utah)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **PHILLIPS** and **SEYMOUR**, Circuit Judges[**]
_____

A petitioner seeking habeas corpus relief on grounds of ineffective assistance

of counsel faces formidable obstacles. He must show both (1) that his counsel's

performance fell below an objective standard of reasonableness, and (2) that the

deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[**] The Honorable Neil Gorsuch heard oral argument but did not participate in the order and judgment. The practice of this court permits the remaining two panel judges, if in agreement, to act as a quorum in resolving this appeal. *See* 28 U.S.C. § 46(d); *see also United States v. Wiles*, 106 F.3d 1516, 1516 n* (10th Cir. 1997) (noting this court allows remaining panel judges to act as a quorum to resolve an appeal); *Murray v. Nat'l Broad. Co.*, 35 F.3d 45, 48 (2d Cir. 1994) (remaining two judges of original three judge panel may decide petition for rehearing without third judge), *cert. denied*, 513 U.S. 1082 (1995).

(1984). To satisfy the prejudice prong, the petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

Thomas James Zajac claims that his counsel's deficient performance at his jury trial meets this standard. But the government presented overwhelming evidence supporting Zajac's conviction for the 2006 bombing of the Salt Lake City Library. Like most trials, Zajac's trial was imperfect, but the government presented strong evidence from multiple, independent sources that supported the jury's guilty verdict. In the face of this evidence, Zajac cannot demonstrate a reasonable probability that, absent the alleged deficient performance, his trial's outcome would have changed. Thus, we deny his request for habeas relief.

## BACKGROUND

On September 15, 2016, a homemade pipe-bomb inside an Arby's paper bag exploded on the third floor of the Salt Lake City Public Library. The explosion shattered a window and required people to evacuate the building, but, by luck, no one was injured or killed. Investigators soon found evidence pointing to Zajac as the bomber.

**I.     Materials at the bombing scene linked Zajac to the bombing.**

At the bombing scene, investigators found a torn piece of card-stock packaging from a model-rocket engine made by the Estes Company. A price sticker on the packaging showed that the rocket engine had been purchased at a Hobby Lobby store, and the last digit of the three-digit store number (the only one legible) was "4,"

which was consistent with many Hobby Lobby stores, including "204," the number of a store in Westmont, Illinois.[1] That store is a five-to-ten-minute drive from the apartment Zajac rented. In 2006, Utah had no Hobby Lobby stores.

In the bomb remnants, law-enforcement officers also recovered smokeless gunpowder, which visually matched a type of gunpowder called Alliant Blue Dot. Other remnants included stranded-metal wire with solder on it, a white adhesive, and alligator clips. Later, when police searched Zajac's apartment, they found similar materials.

## II. A threatening letter about the bombing was postmarked from Omaha, Nebraska just after Zajac had visited the city.

A month after the bombing, the chief of the Salt Lake City Police Department received a letter, postmarked from Omaha, Nebraska.[2] The letter referenced the Salt Lake City bomb, used profanities against the police, blamed police for alleged abuses, and threatened more violence: "I fired a shot over your bow as a punishment . . . . When you fucked with mine, you picked the wrong person. . . . Had it been me, I would have shot your officers dead. And that is still on the table, picture it, coffee shop, back of head shot." R. vol. 24 at 68. The letter also threatened a future, larger bomb that would be "designed to kill" and "placed in a public place again, but in a

_____

[1] At the time of the trial, there were 455 Hobby Lobby stores in the United States.

[2] The letter was addressed to the chief of the Salt Lake City Police Department, but was delivered to the North Salt Lake Police Department because it had the wrong address. That department notified the Salt Lake City police and a Salt Lake City officer retrieved the letter.

crowd this time." *Id.* "If at least one person isn't killed, I will simply go again," the letter warned. *Id.* Zajac's adult daughter, Allison Zajac, testified at trial that he had visited her in Omaha, Nebraska the weekend before the Monday that the threatening letter was postmarked and on its way to the Salt Lake City Police Chief.

## III. The search of Zajac's apartment revealed materials linking him to the Utah bombing.

Law-enforcement officers recovered a fingerprint from card stock among the bomb remnants. Using a national law-enforcement database, investigators found a match for the fingerprint on the card-stock packaging: Thomas Zajac. After obtaining warrants, ATF agents arrested Zajac and searched his Illinois apartment.

During the search of the apartment, agents seized physical evidence linking Zajac to the Utah bombing. For instance, inside a vacuum cleaner in a storage locker in Zajac's basement, agents found smokeless gunpowder visually consistent with the Alliant Blue Dot powder used in the library bomb.[3] They also seized a container of silicone sealant containing adhesive visually and chemically consistent with that found in the bomb remnants, as well as pliers with that adhesive in the teeth; alligator clips similar to those used in the bomb; two rolls of solder; and two soldering irons. As mentioned, they had earlier recovered a strand of wire with melted solder from the bomb remnants.

---

[3] This gunpowder was not forensically tested because of its small quantity. The government witness testified that the presence of a blue disk made the powder consistent with Alliant Blue Dot gunpowder; the powder itself did not. The district court ruled that the government's argument that Alliant Blue Dot gunpowder was found in Zajac's storage locker was proper.

**IV.    At trial, witness testimony, phone records, bills, and Zajac's history with police bolstered the government's case against him.**

Prosecutors charged Zajac with seven felonies stemming from the bombing.[4] The prosecution entered a wealth of physical, phone, video, and circumstantial evidence tying Zajac to the bombing. For instance, Allison Zajac and Zajac's ex-wife, Sharon Zajac, identified Zajac on a surveillance videotape entering the library with a black briefcase and remaining for just seven minutes, less than half an hour before the bombing. In addition, Zajac's credit-card records and cell-tower hits on his phone placed him in the Chicago area on September 12, and then showed him traveling across the country until reaching Evanston, Wyoming on September 14. Hotel receipts from the Days Inn in Evanston, three miles from the Utah border, showed that Zajac registered to stay there on the nights of September 14 and 15.

Zajac's known activities on the day of the bombing were highly probative. On September 16, by 10:12 a.m., he had checked out of the Days Inn in Evanston. At 11:31 a.m., he bought gasoline in Park City, Utah, about 50 miles south of Evanston. This placed him about 30 miles north of Salt Lake City. As described by the government during closing argument, the videotape revealed that at 12:14 p.m., a

---

[4] The felonies were for attempting to damage and destroy a building by means of an explosive device (18 U.S.C. § 844(i)); using or carrying a destructive device in relation to a crime of violence (18 U.S.C. § 924(c)(1)(B)(ii)); possession of an unregistered destructive device (26 U.S.C. § 5861); possession of a destructive device following a domestic violence conviction (18 U.S.C. § 922(g)(9)); possession of a destructive device as a felon (18 U.S.C. § 922(g)(1)); transportation of explosives in interstate commerce with the intent to damage and destroy a building (18 U.S.C. § 844(d)); and willfully using the mail to threaten the use of explosives (18 U.S.C. § 844(e)).

blue-shirted man carrying a black briefcase entered the Salt Lake City library. Nine minutes later, he left the library. At 2:12 p.m., again shown by videotape, the same man, later identified by his daughter and ex-wife as Zajac, returned to the library and left after seven minutes. Fifteen minutes later, at 2:34 p.m., the bomb exploded. By 4:31 p.m., Zajac had driven back to the interstate highway and traveled the 80 or so miles back to the Evanston Days Inn. Once there, he registered for the night.

The prosecution also entered evidence concerning Zajac's motive. Adam Zajac, Zajac's son, testified that in 2004, Salt Lake City police officers had cited him for driving under the influence after he received medication as part of his medical treatment and later that day got into a car accident. Adam Zajac told his father about the incident. In addition, a Hinsdale, Illinois police detective testified that in 2005, after he had arrested Adam Zajac for an outstanding traffic warrant, Zajac went to the police station to bail his son out. While there, he berated the officers with profanities, and even angrily ripped a calendar off the wall. He also struck his wife in the face when she attempted to calm him (but the district court barred the prosecution from mentioning this conduct at trial). As Zajac was being booked for this battery, he repeatedly threatened the booking officer, warning that, "I know where you work." R. vol. 24 at 361. The prosecution also presented evidence that Zajac was a generally volatile person prone to angry confrontations.

V.    **The jury and the district court found Zajac's explanations unconvincing.**

Before his trial, in statements later recounted at his trial, Zajac admitted that he had been in the Salt Lake City library around the same day as the bombing. He

6

told one journalist, Todd Tanner, that it was not unusual for him to pass through Salt Lake City, and that he visited Salt Lake City in September 2006 to learn more about the Church of Latter-Day Saints, which his daughter was considering joining. Zajac told another journalist, Brian Mullahy, that in September 2006 he had traveled to Salt Lake City on his way from Chicago to Phoenix. He told Mullahy that, while there, he asked Mormon missionaries for information about their Church and that they directed him to the public library.[5] Zajac told Tanner that he visited the library within a few days of the bombing, and that because he had been on a diet heavy in fruits and vegetables, he had to use the library's most easily accessible restroom, located on the library's lower level.

As for why he suddenly abandoned his trip to Phoenix, Zajac told Mullahy that he had begun feeling ill at the library and soon after learned from a call to his sister in Chicago that his mother was ill too. For these reasons, he said, he turned around and drove back to the Chicago area to be with her. But Zajac's phone records showed no such call. Nor did Zajac explain to Mullahy why he stopped at the Evanston Days Inn at 4:31 p.m., several hours before nightfall, when he wanted to see his sick mother. The jury could also consider that Zajac apparently did not tell Tanner, the other journalist, about his sick mother.

At trial, Zajac's counsel argued that Zajac's son Adam was the more likely culprit, and that he had gone to elaborate lengths to frame his father. Counsel pointed

---

[5] Citing the welcoming and energetic approach of much religious missionary work, the government argued this account was highly unlikely.

to Adam Zajac's proficiency with electrical work, his past unfavorable encounters with police, and his angry split with his father that caused Adam and his wife to move out of Zajac's home. Obviously, the jury did not believe this account.

In addition to hearing from the government's expert that Zajac's known fingerprint was consistent with that left on the card stock in the bomb remnants, the district court also learned during the habeas hearing that Zajac had admitted in a letter to his counsel that the fingerprint indeed was his. And he offered a story for how it got there. As he approached the library's doors, Zajac said, he saw a piece of card stock blow between the legs of a woman wearing a red skirt. He claimed that he picked up the card stock and put it in the hoodie of a homeless person walking by him.

VI. **On habeas review, the federal district court found a number of trial errors, but no prejudice.**

After the jury convicted Zajac on all counts, the district court denied Zajac's motions for a judgment of acquittal and for a new trial and sentenced him to four hundred and twenty months in prison. On direct appeal, we affirmed the convictions. *United States v. Zajac*, 482 F. App'x 336 (10th Cir. 2012).

Zajac then filed a pro se 28 U.S.C. § 2255 habeas corpus petition to vacate his convictions, alleging prosecutorial misconduct and ineffective assistance of counsel. After a three-day hearing, the district court denied relief, while still pointing to what it called "a number of troubling issues." R. vol. 5 at 232.

8

First, the district court found that the prosecution had made numerous misstatements. For instance, the district court said that during the government's opening statement, it incorrectly said that investigators had found a model-rocket engine in the Salt Lake City bomb remnants.[6] The district court also faulted the government for misstatements in closing argument that the fingerprint on the card stock was "of Thomas Zajac" and "characteristic of one and not any other," R. vol. 26 at 105-06, rather than simply using the court-approved language of "match closely" or "consistent with the known print of," R. vol. 25 at 371; that Zajac's fingerprint was recovered on the bomb; that two witnesses had said that Zajac told them he had been in the library on the day of the bombing (instead of a day or two before that day); that Allison Zajac identified Zajac from khaki pants worn by the man on the video (when she apparently identified him much better than that); that Alliant Blue Dot gunpowder was found in multiple locations in Zajac's apartment;[7] that agents found no ammunition in Zajac's apartment when they had found some ammunition; that a pipe-bomb with a timer was unusual (both the Salt Lake City and Hinsdale bombs had timers); that the batteries found in Zajac's apartment had their

---

[6] Instead, a model-rocket motor was found at the earlier bombing in Hinsdale, Illinois.

[7] In fact, the gunpowder found in the vacuum was the only gunpowder found that was visually consistent with Alliant Blue Dot gunpowder.

identifying labels scratched off;[8] and that the batteries found in Zajac's apartment were the same type as those found at the bomb scene.[9] Finally, the district court found that during its opening and closing arguments, the government had created an improper inference that Zajac had been arrested for hostile conduct toward the police instead of domestic violence against his wife. Zajac's defense counsel did not object to these alleged misstatements.

Second, the district court noted a number of what it believed were evidence-gathering deficiencies by the government. The court was troubled that the government had not retrieved surveillance videotape from 13 of the 31 possible areas in the library. Although finding that the video footage was "irretrievably lost," the court did not attribute bad faith to the government. R. vol. 5 at 198-99. The court also criticized the government for returning two briefcases and one envelope seized during the search of Zajac's apartment to his sister, whom he had authorized to collect his belongings and with whom he had stayed in contact more than he had with his daughter or ex-wife. In the district court's view, this somehow prevented the three items from being tested for exculpatory evidence. The district court also found that the government's process for dusting and lifting fingerprints from the bomb timer had precluded any DNA analysis.

---

[8] The labels that had been scratched off were warning labels, not identifying labels.

[9] The batteries at Zajac's apartment were heavy-duty 9-volt batteries. The batteries at the bomb scene were alkaline 9-volt batteries.

Third, the district court criticized the government for not obtaining a surveillance videotape it believed local police had obtained from a store near the UPS store in Illinois, from where they alleged Zajac had mailed his second threatening letter—this one to the Hinsdale, Illinois police department.[10] In the district court's view, this somehow bore on whether it should have allowed evidence of the September 1, 2006 bombing in Hinsdale under Fed. R. Evid. 404(b). The prosecution had contended that Zajac was responsible for that bomb, too, and it relied in part on the threatening letter sent to Hinsdale police—a letter that had three fingerprints that were consistent with Zajac's.[11] The Illinois bomb and letter had many striking similarities to the Salt Lake City letter and bomb. For example, the Hinsdale letter stated that, "I fired a warning shot" as compared to the Utah letter's mention of a "shot over your bow as a punishment." R. vol. 24 at 68, 349. The Hinsdale letter warned that, "If it doesn't kill, I will repeat as necessary," similar to the Utah letter's warning that, "If at least one person isn't killed, I will simply go again." *Id.* at 68, 350. The two letters also contained similar language about how the police had been "humiliated," how the police had picked on the "wrong person," and how the author

---

[10] The facts are unclear on this point. At worst, the Hinsdale Police Department had a video surveillance tape from the store near the UPS store and never turned it over to the ATF. But we are not sure that the Hinsdale police ever had such a tape, though a report says it did. In any event, the federal government never obtained the surveillance footage from that store.

[11] The district court also authorized the expert to testify that "in his opinion the fingerprints match closely." Order at 2, United States v. Zajac, No. 2:06-cr-00811 CW (D. Utah Sept. 16, 2010), ECF No. 438.

would continue until the police were forced to take additional, costly security measures. *Id.* at 68, 349-50. Both letters contained the same ultimatum: "It's up to you, asshole." *Id.* at 68, 350. But the district court thought that the video could conceivably have been exculpatory (obviously, it could also have been inculpatory). In any event, the district court commented that had it known during the trial that the government had not obtained the video from local Illinois police, it would not have admitted any of the Rule 404(b) evidence related to the Illinois bombing. We see no issues with the 404(b) evidence, with or without the store video.

Fourth, the district court questioned why Zajac's defense attorneys had not interviewed certain witnesses when determining their defense strategy. Specifically, Zajac claimed that certain witnesses may have generally identified others who were near the bomb before it exploded. The district court further faulted defense counsel for not fully coordinating their opening statement with the evidence that they thereafter presented.

Despite these findings, the district court denied the ineffective-assistance-of-counsel claims because Zajac could not show that he suffered prejudice. But the district court did grant a certificate of appealability (COA) for those claims, meaning that it found that Zajac had "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

Zajac filed a motion asking the court to reconsider its § 2255 denial. The court treated it as a motion under Fed. R. Civ. P. 60(b) seeking relief from a judgment or order. The court certified an additional ineffective-assistance issue for appeal

12

(counsel's failure to interview another witness), refused to certify other issues, and transferred Zajac's new arguments and issues to us because it found them to constitute a second or successive habeas petition requiring circuit authorization. Zajac moved for a remand, arguing that the district court had erred in construing two of his claims as second or successive claims. We denied the motion for remand. Zajac now appeals the district court's denial of his § 2255 ineffective-assistance-of-counsel claims.

## DISCUSSION

### I.     Standard of Review

To succeed on a claim for ineffective assistance of counsel, a defendant must show both that his lawyers provided him with deficient representation and that the deficiencies prejudiced him. *Strickland*, 466 U.S. at 687. To perform deficiently, counsel must make "errors so serious that counsel was not functioning as the counsel" that the Sixth Amendment guarantees to a defendant. *Id.* (internal quotation marks omitted). In other words, the defendant must show that his counsel fell below an objective standard of reasonably effective assistance. *Id.* at 687-88. We must be highly deferential to the performance of counsel and maintain a strong presumption that counsel has performed within "the wide range of reasonable professional assistance." *Id.* at 689. A deficiency prejudices a defendant if the defendant can show that, but for the deficiency, there is a reasonable probability that the jury would have reached a different result. *Id.* at 694. "The result of a proceeding can be rendered

13

unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id.*

As a practical consideration, we need not examine both prongs if one or the other is lacking. *Id.* at 697. In reviewing § 2255 denials after a COA has been granted, we review the district court's legal conclusions de novo and its fact findings for clear error. *United States v. Viera*, 674 F.3d 1214, 1217 (10th Cir. 2012). Mere speculation cannot satisfy the ineffective-assistance prejudice standard. *Byrd v. Workman*, 645 F.3d 1159, 1168-69 (10th Cir. 2011).

## II. Zajac cannot show prejudice.

Because we find no prejudice, we address only that prong. Even if we agreed with the district court's findings of error, the overwhelming evidence leaves us confident that the jury would have convicted Zajac of all charges. None of the government's alleged errors furnished the foundation of the government's case. The government proved Zajac's guilt with physical evidence tying Zajac to the bomb, circumstantial and witness evidence placing him at the library soon before the bomb exploded, and evidence of his motive for exploding a bomb in Salt Lake City. We affirm the district court's finding that any errors in the trial did not create a reasonable probability of a different outcome.

### A. The trial errors were not enough to change the inferences of the jury or the outcome of the trial.

As outlined above, strong physical, circumstantial, and witness evidence implicated Zajac. The government's alleged mistakes and the defense's failure to

14

object to them did not undermine that strong foundation. For example, the government did overstate the fingerprint evidence: at trial, the court allowed the government's fingerprint-matching expert to testify that it was his opinion that the fingerprint from the card-stock packaging was consistent with Zajac's, but not that it was his. During closing, the prosecutor misspoke by saying that the fingerprint was "of Thomas Zajac" and "characteristic of one and not any other." R. vol. 26 at 105-06. But that error was not so significant that the fingerprint evidence lost its highly probative value—the fingerprint still pointed to Zajac.

Likewise, the government also misstated that Zajac's daughter identified him in the library video based on his khaki pants. But that did not diminish that she and her mother positively identified Zajac on much firmer grounds.[12] And in another example, the prosecution overstated the locations in Zajac's apartment where agents found gunpowder that visually matched the type used in the bombing—yet some such gunpowder was indeed found in the vacuum in Zajac's storage locker.

Any errors the defense made in not objecting to any misstatements in the government's closing arguments were further blunted by the court's reminder to jurors before they began their deliberations that "[s]tatements and arguments of counsel are not evidence in this case." R. vol. 26 at 67. If jurors felt that the prosecutor's statements conflicted with their memory of the evidence, the court had

---

[12] Allison Zajac cited the man's walk, shoes, and how he was holding the briefcase; Sharon Zajac cited the man's attire, the briefcase and how he was holding it, and his hairline. The record also suggests that Allison Zajac cried as she identified her father on the surveillance videotape.

told them that "it is your recollection which should control during your deliberations." *Id.* at 80. We generally presume that juries follow the instructions of the court. *United States v. Taylor*, 514 F.3d 1092, 1100 (10th Cir. 2008); *see also United States v. Batton*, 527 F. App'x 686, 688-89 (10th Cir. 2013) (unpublished) (finding that the defense's failure to object to the government's misstatement during the closing argument did not establish prejudice given the context of the whole trial and record).

Nor are we troubled by the district court's admission of Rule 404(b) evidence concerning the bombing in Hinsdale, Illinois. Prosecutors linked Zajac to that bomb by showing that the materials used—such as an Estes rocket motor—had similarities to items found in Zajac's apartment and at the library, and that the threatening letter that Hinsdale police received was similar to the one that Salt Lake City police received. Multiple witnesses discussed the Illinois bombing and the threatening letter, and the government emphasized the incident during closing arguments. Whatever the district court's misgivings on review, we see no issue with admission of the Rule 404(b) evidence—the jury had more than enough evidence to convict solely from the Salt Lake City bombing.

Even if the errors did not undermine the government's case, Zajac argues that in their absence, the jurors would have considered "the prosecution team's deceit" and changed their inferences about the evidence. Appellant Opening Br. at 10. The jurors, who were allegedly "basking in the prestige of the articulate Assistant United States Attorneys," might have viewed the "phalanx of the federal government's

16

impressive witnesses" with less credulity. *Id.* at 11. Or perhaps the errors were so pervasive that they might have affected the trial's outcome. *See Strickland*, 466 U.S. at 695 (holding that courts must assess the totality of the evidence presented when considering ineffective-assistance prejudice). We are not persuaded. The bulk of the government's case was untouched by the errors, and we will not assume that successful objections by the defense would have weakened otherwise strong evidence. The evidence presented against Zajac at trial was simply too great to permit speculation to undermine the jury's verdicts.

   **B.     Defense counsel's trial strategy did not prejudice Zajac.**

   Zajac argues that his trial counsel inadequately investigated the case before deciding on a strategy and then failed to call a number of witnesses who might have provided alternative versions of events. Counsel alluded to some of these witnesses in the opening statement. But the impact that these different strategies and witnesses may have had is highly speculative. For example, Zajac argues that the defense should have called witnesses to prove that his stepson, Kirk Lauterback, was the actual bomber. But at the habeas hearing, defense counsel testified that he could find no proof that Lauterback had the motive or ability to bomb the library or that he had even been in Salt Lake City near the time of the bombing—at the time, he lived in Omaha, Nebraska.

   Zajac also argues that he was prejudiced by his counsel's failure to call witnesses who might have established that his son Adam set off the bomb and then framed his father because of past family disagreements. But Zajac did not call

17

Lauterback or any of the other possible witnesses to testify at the habeas hearing, preventing us from more fully assessing what effect their testimony might have had. Nor was the discrepancy between the defense's opening statement about witnesses and the evidence actually presented enough to create prejudice, especially given the significant amount of time and evidence that came between the opening statement and jury deliberations. We thus doubt that the defense's decisions about these witnesses and strategies were errors, let alone prejudicial ones.

### C. The errors did not amount to cumulative prejudice.

Similarly, Zajac also argues that even if the trial errors did not directly undermine specific pieces of the government's case, their absence would have eroded the jury's general trust of the government. "A cumulative-error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Cargle v. Mullin*, 317 F.3d 1196, 1206 (10th Cir. 2003) (quoting *United States v. Toles*, 297 F.3d 959, 972 (10th Cir. 2002)) (internal quotation marks omitted). But Zajac's cumulative-error claims do not rise above the level of hope and speculation. We have no reason to believe that any juror would have been persuaded away from a guilty verdict based on a vague sense of dubious impropriety alone, especially given the ample evidence supporting the government's theory.

Zajac received a fair trial and was fairly convicted. The government presented a solid case and the jurors accepted it. The trial errors did not undermine the core of that case, nor were they collectively so pervasive as to change the character of the

18

proceeding. As *Strickland* noted: "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." 466 U.S. at 696. The verdicts in Zajac's case were decidedly the latter.

## CONCLUSION

For these reasons, we affirm the district court's denial of Zajac's § 2255 habeas petition.

Entered for the Court

Gregory A. Phillips
Circuit Judge

19